IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 07-cv-01814-WDM-MJW

DEBBIE ULIBARRI;
ESTATE OF SHAWN FRANCISCO VIGIL;
COLORADO CROSS-DISABILITY COALITION, a Colorado corporation;
COLORADO ASSOCIATION OF THE DEAF, a Colorado corporation;
ROGER KREBS; and
SARAH BURKE,

       Plaintiffs,

v.

CITY & COUNTY OF DENVER;
ALVIN LACABE, in his official capacity as Manager of Public Safety for the City &
County of Denver, and in his individual capacity;
WILLIAM LOVINGIER, in his official capacity as Director of Corrections and
Undersheriff for the City & County of Denver, and in his individual capacity;
RON D. FOOS, in his official capacity as Division Chief for the County Jail Division for
the City & County of Denver, and in his individual capacity;
GARY WILSON, in his official capacity as Division Chief for the Pre-Arraignment
Detention Facility Division, and in his individual capacity;
GERALD R. WHITMAN, in his official capacity as Chief of Police, and in his individual
capacity,

       Defendants.

---

## ORDER ON PENDING MOTIONS

---

Miller, J.

       This case is before me on the Objections (ECF Nos. 80 and 113) to orders entered

by Magistrate Judge Michael J. Watanabe, the Motion for Summary Judgment (ECF No.

197) filed by the City and County of Denver and the individual Defendants in their official

capacities[1] ("Denver"), the Motion for Summary Judgment (ECF No. 198) filed by the

---

       [1]Claims against government employees in their official capacities are considered
to be claims against the entity that employs them.  *Pietrowski v. Town of Dibble*, 134

individual Defendants in their individual capacities, the Motion to Strike (ECF No. 224) filed

by Plaintiffs, and the Motion to Strike Exhibits (ECF No. 243) filed by Defendants.  I have

reviewed the parties' written arguments and the evidence submitted with their briefs and

conclude that oral argument is not required.  For the reasons that follow, the Objections to

the orders of Magistrate Judge Watanabe are overruled.  The Motions for Summary

Judgment and Motions to Strike are granted in part and denied in part as set forth below.

Background[2]

This is a civil rights and disability rights case concerning the arrest and detention of

several deaf individuals by the members of Denver's Police and Sheriff Departments and

the practices of those entities with respect to persons with disabilities.  The persons

arrested and detained are Shawn Vigil, now deceased and represented here by his Estate,

Plaintiff Roger Krebs, and Plaintiff Sarah Burke.  Plaintiff Debbie Ulibarri is the mother of

Mr. Vigil.  Plaintiffs Colorado Cross-Disability Coalition ("CCDC") and Colorado Association

of the Deaf ("CAD") assert claims seeking injunctive and other equitable relief.  The

Defendants are Denver and several of its employees, including supervisory members of

the Sheriff and Police Departments.

The Denver Sheriff Department operates two facilities at issue in this litigation: the

Pre-arraignment Detention Facility ("PADF") and the Denver County Jail (the "Jail").

---

F.3d 1006, 1009 (10th Cir. 1998) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66
(1985)).

[2]The following facts are taken from the parties' briefs and attached exhibits and
are undisputed unless otherwise noted.  Facts that I have excluded pursuant to the
Motions to Strike, discussed *infra*, and those I consider immaterial are not included in
this recitation.

Medical services are provided at these facilities by employees of the Denver Health and Hospital Authority ("DHHA"), a separate and independent governmental entity not a party to these proceedings.

I will first review the backgrounds and events involving the three persons detained.

Shawn Vigil

Vigil became "profoundly" deaf at the age of two as a result of a severe bacterial infection. He attended the Colorado School for the Deaf and Blind in Colorado Springs, Colorado, where he communicated in large part through American Sign Language ("ASL")[3].

According to one of Vigil's school records from 2004, "Shawn's primary mode of communication is sign language." Exh. 22 to Plaintiffs' Response, ECF No. 229-23. He spent time with his family in Denver on weekends and vacations. His family are all hearing and know little sign language. He communicated with them through gestures and written notes; however, his writing was sometimes difficult for his family to understand. School records from 2004 indicate that he read at approximately a second grade level. Exh. 22 to Plaintiffs' Response, ECF No. 229-23. He could read lips for simple words like "Hi" or "good bye" but otherwise was unable to read lips. Vigil lived mostly with his grandparents, whose home had a telephone device for the deaf ("TDD"), which uses relay systems to permit deaf individuals to communicate with others over the telephone.[4] Vigil's mother

---

[3] As explained by Plaintiffs' expert witness, ASL is a separate and distinct language from written or spoken English, and uses its own grammatical rules and syntax. Dr. Jean F. Andrews Aff., Exh. 23 to Plaintiffs' Response, ECF No. 229-24, ¶ 3. Deaf persons vary widely in their ability to understand and to communicate using written and spoken English. Andrews Dep., Exh. 1 to Plaintiffs' Response, ECF No. 229-2, 13.

[4] Two types of devices are discussed throughout the parties' briefs and evidence, TDD and TTY. The evidence shows that a TTY involves older technology and that a

denied that he had any history of depression or of anxiety or treatment for those conditions. However, his school records reflect that he had some behavioral issues at school and received some counseling in 2000.  Exh. 22 to Plaintiffs' Response, ECF No. 229-23.

Vigil was arrested by Denver police on August 17, 2005 and charged with second degree kidnapping, second degree sexual assault, and criminal attempt.  At the time of his arrest, he was twenty two years old.  He had no previous arrests or detentions.

Vigil was first taken to the PADF on the day of his arrest, August 17, 2005.  He was seen by nurse Robert Kelly Costin for a routine initial medical assessment.  The document used for such screening is titled "Denver Sheriff Department Medical Services - Admission Assessment" and contains a listing of categories, including Drug Allergies, Mental Health History, etc.  Nurse Costin had no memory of his interaction with Vigil, but the form he filled out regarding Vigil provides as follows:

> Mental Health History:      Denies hx / current problem
>
>                      * * *
> Mental Status:              Appropriate / oriented
>
> Behavior:                   Calm/cooperative
>
>                      * * *
>
> Additional: IS DEAF.   DOES NOT READ LIPS. DOES COMMUNICATE BY WRITING.  CLAIMS NEGATIVE FOR ALL MEDICAL PROBLEMS, IN WRITING.  HOUSED ALONE FOR THIS REASON.

---

TDD is more computerized.  Andrews Dep., Exh. 1 to Plaintiffs' Response, ECF No. 229-2, 33.  I understand that these devices are not equivalent but for the purposes of this order will refer to this assistive technology in all instances as a "TDD."

Crum Aff. Attach. 1, Exh. A-6 to Denver's Mot. for Summ. J., ECF No. 197-9.

Nurse Costin testified in his deposition that his usual practice is to ask the detainee if he has a mental health problem. If the detainee reports a current mental health problem or appears to need further screening, Nurse Costin refers to the inmate to a psychiatric nurse, available only during daytime hours, for an in-depth mental health screening and evaluation for medications. Costin testified that the screening process is important in determining whether a detainee is suicidal but also testified that in routine cases he goes through his screening process in approximately twelve to fifteen seconds.

Nurse Costin explained that his usual practice for getting information from deaf detainees is to write out the questions for the forms for the detainee to read. He usually recommends housing a deaf detainee with another cellmate so the cellmate can get attention for the deaf detainee's needs. He does not specifically recall why he recommended housing Vigil alone, although he stated it was possible that a deputy made this suggestion for safety reasons.

Vigil had an initial court appearance before a Denver County Court Judge on August 18, 2005 in Case No. 05F04992, and his bond was set at $100,000. A sign language interpreter was provided at the hearing and Vigil was represented by a public defender. Vigil's next court hearing was his second advisement on August 24, 2005. Again, he was provided with a sign language interpreter and had a public defender.

While at the PADF, Vigil used a TDD to call his grandparents' house, where he communicated with his mother, Plaintiff Ulibarri. She told him that his bond was too high and she could not get him released. He expressed concern about how long his sentence would be. At some point while at the PADF, Vigil had another inmate call his grandparents'

home for him.  The inmate spoke to Vigil's brother and relayed something to the effect that Vigil was having a hard time, did not understand what was going on and wanted a lawyer.

Vigil was transferred from the PADF to the Jail on August 25, 2005.  At the time, the Jail received an average of 50 inmates each morning.  Routine processing by the deputy sheriffs included a search of each inmate, a shower and uniform for each inmate, an individual meeting with a deputy sheriff for the purpose of classification and cell assignment, and a medical screening.  Initial housing decisions are made by the classification officer, but then sometimes adjusted after the medical screening.  The Jail has mental health units for inmates with mental health issues.  Deputies do not have access to an inmate's medical screening or other medical records.[5]

Vigil met with Deputy Sheriff Randy Coleman, a classification officer.  The form completed is titled "Denver County Jail, Classification Intake Questionnaire."  Exh. A-12 to Mot. for Summ. J., ECF No. 197-15.  It contains a list of questions with boxes to check "Yes" or "No."  Among the questions asked are: "Have you ever attempted suicide?", "Do you want to see the medical staff?",  "Do you claim a disability?", "Are you  a U.S. citizen?"  On Vigil's form, these questions are marked "No" despite that fact that Vigil was deaf and was, in fact, a U.S. citizen.  On another question, "Did you have access to a phone?", both answers are crossed out and a hand written notation of "Deaf" is added.  There is a section for the deputy to fill out regarding observations, specifically whether the inmate appears "injured, disabled, sick, anxious, withdrawn, hostile, depressed, under the use of

_____

[5]Because medical services at the Jail are provided by DHHA, medical personnel have access to records of any inmate seen at any other DHHA facility, such as Denver Health Medical Center, a public hospital.

alcohol/drugs, aggressive, confused, suicidal." None of these was circled on Vigil's form. Vigil signed the form.

Deputy Coleman's usual practice is to read aloud the questions to the inmate and note the answers. In the past he has interviewed deaf inmates and his practice has been to give the form to the inmate to read and point to the answers. He does not recall his screening of Vigil and could not say how he would have ensured that Vigil understood the questions. Deputy Coleman's practice then is to give the inmate the Jail's inmate handbook, which explains information about the Jail, including how to submit a "kite," or a written request, to deputies. Deputy Coleman does not explain the handbook. Deputy Coleman was not aware of any policy regarding when and how to bring an ASL interpreter to assist with the screening process and there is no evidence that an interpreter was provided during Vigil's screening. Deputy Coleman also does not recall any special training regarding intake procedures to use when dealing with deaf inmates.

Vigil's form from the medical screening, the "Denver County Jail Health Assessment," contains space for the nurse to list current complaints, allergies, chronic diseases, and medications. Crum Aff. Attach. 1, Exh. A-6 to Denver's Mot. for Summ. J., ECF No. 197-9. There are also boxes to check for family history, social history, assessment, physical exam, and other areas. *Id.* Vigil's form is essentially blank other than a recording of Vigil's temperature, pulse, and blood pressure, even where there is a box to check for "none" or "no." *Id.* Similarly, there is a form for the mental health screening, which is completely blank other than Vigil's name and inmate number. *Id.*

Vigil was assigned a classification code that all disabled or special needs inmates receive; inmates may receive more than one classification code. He was assigned to

administrative segregation. This is a non-punitive classification consisting of confinement to a single cell, which may be imposed for the inmate's safety. An inmate may be classified in administrative segregation if he is unable to live in the general population for any reason. Aside from Vigil's deafness, which would have made him vulnerable in the general population, other factors that may have contributed to his placement include his youth, lack of previous experience in the criminal justice system, and the fact that he was charged with a sex assault. Vigil was housed in Building 6 of the Jail, which houses the special management inmates, including those classified as administrative segregation.[6]

In general, inmates in administrative segregation in 2005 retained the same privileges as those in the general population, including 45 minutes of out-of-cell and recreation time, television time, library time, access to telephones and showers, and the opportunity to be a tier clerk.[7] There is a TDD at the Jail.[8] However, the TDD is not in the same place as the other telephones and an inmate must specifically request to use the TDD, which is located in the sergeant's office. The inmate handbook does not provide information about the TDD. It is unclear, then, how an inmate who was unable to communicate with deputies would know or learn of the existence of the TDD. There is no evidence that Vigil used the TDD while he was at the Jail. In addition, there is a factual

_____

[6]Inmates might be housed in Building 6 for a variety of reasons including physical or emotional disabilities, sexual orientation, security issues, protective custody, or administrative segregation.

[7]Tier clerks act as inmate representatives and do certain chores outside of their own cells.

[8]Plaintiffs provide evidence that during a December 2008 inspection pursuant to this litigation the Jail TDD did not work.

dispute about whether the televisions in Building 6 had closed-captioning in 2005 or whether staff is aware of the availability of closed-captioning.

Inmates had opportunities to interact with other inmates during out-of-cell time and recreation time, as well as with inmate tier clerks and deputies and medical staff. Deputies were supposed to make rounds twice an hour[9] and nurses were scheduled to make rounds three times a day to distribute medication and to look in, albeit briefly, on other inmates. Psychiatric nurses were on site seven days a week; physicians and psychiatrists were available on call at any time. Inmates could submit kites to request medical attention or make other requests. Vigil at times had a cellmate while he was at the Jail but was frequently moved and other times was alone in his cell. As discussed further below, the Jail also had available ASL interpreters; however, there is no evidence that there was a written policy in 2005 regarding interpreters or that the deputies and staff were generally aware of the availability of interpreters or how to obtain this service for inmates. There may have been deputies who knew some sign language but it is unclear whether any of them came into contact with Vigil. In general, individual deputies testified that they would communicate with deaf inmates through written notes. The deputies working on the tier while Vigil was at the Jail whose depositions were taken did not recall having any communication with him.

In addition, a deputy would contact each inmate in Building 6 once a week to ask two questions: "Are you having any problems?" and "Do you want to see the administrative

---

[9]Plaintiffs have provided evidence that the logbooks in which such rounds were to be documented often showed gaps for the time period that Vigil was in the Jail, which could mean that the rounds were not done or that they were done but not recorded. These gaps were often in the mornings after breakfast.

review board?" Although the deputy's notes for August 28, September 11, September 18, and September 25, 2005 with respect to these questions show that Vigil responded "no" to the first question, there is no evidence regarding how the information was obtained and a factual dispute regarding whether the deputy's communication with Vigil was effective. The deputy, however, did note "yes" to the second question, *i.e.*, that Vigil wanted to see the Administrative Review Board[10] ("ARB"), in notes for August 28, September 18, and September 25, 2005. Vigil was not seen during the week of August 28 because of time constraints and volume. It is unclear why he did not meet with the ARB during the week of September 18; there is a notation in the ARB's records next to his name saying "Declined?" Vigil's classification was not changed while he was at the Jail.

In addition, there was a practice at the time for a member of the nursing staff to make an additional round each week to see all the inmates housed in the special management area of Building 6. Forms were filled out regarding visits with Vigil on August 27, September 3, September 10, and September 24, 2005. No problems were noted but there is no evidence regarding how communication with Vigil was conducted or whether it was effective.

Vigil had a preliminary hearing on September 16, 2005, which was scheduled to be continued on October 7, 2005. As before, a sign language interpreter was provided and Vigil was represented by a public defender.

No one from Vigil's family visited him while he was at the PADF or at the Jail. It

---

[10]The ARB is a panel of classification officers who review inmate housing and classification and hears complaints or concerns from inmates about their incarceration. The ARB meets at least once a week.

does not appear that he had any other visitors either. His mother attended his court hearings and had one opportunity to interact with him after a hearing as he was being escorted to an elevator. He appeared to Ulibarri to be in distress and cried at one point. Ulibarri did not inform anyone at the Denver Sheriff Department to let them know of concerns about her son or that he was a suicide risk. She called the Jail once to find out why she had not heard from Vigil and was told that the Jail did not have any equipment for him to use. Vigil was in the Jail on his birthday, August 29.

Around 9 a.m. on the morning of September 27, 2005, another inmate was out of his cell and found Vigil hanging. He informed the deputies on duty, who immediately summoned medical staff and supervising officers. Vigil was cut down from his noose and nursing staff arrived quickly and began CPR. An ambulance was called and Fire Department paramedics arrived around 9:15 and continued CPR. Vigil was transported to the hospital but did not survive his injuries. Vigil died on October 1, 2005; the cause of death was complications from ligature hanging.

Earlier in the day, a nurse had made a round around 6 a.m. Breakfast was served to inmates in their cells. It is unclear when the last round had been made; a deputy on duty claims that he made a round past Vigil's tier at around 8:25 a.m. but the logbook does not document an entry at that time. On the day of his suicide, Vigil was housed in a cell that was the second farthest away from the officers' cage (seventeenth of eighteen), although his classification required that he be housed near the cage.

An internal affairs investigation was done, which focused on whether the Sheriff Department personnel had followed Department policies and procedures. The investigation appears to have examined primarily the events following the discovery of Vigil's hanging.

A comment was received from the Office of the Independent Monitor suggesting that more investigation be done regarding whether there were any warning signs that Vigil was a suicide risk. It does not appear that any further investigation was done in this regard.

Plaintiff Ulibarri testified in her deposition that Vigil sent her a letter while he was incarcerated. Ulibarri recalled that the letter contained a picture of a "sad face" and said that Vigil loved and missed his family.[11] There is no evidence that Vigil was depressed, suicidal or had attempted suicide before being incarcerated.

At the time of Vigil's incarceration, the Jail was at 140-150% capacity with no corresponding increase in staffing levels. During this time period there was a 177% increase in assaults on staff and the critical incidents requiring the use of force increased 120% from the previous year.

Plaintiff Sarah Burke

Plaintiff Sarah Burke has been deaf since birth. She communicates using ASL and with hearing individuals through writing and gestures. Burke uses email and text devices. If she needs to see a professional, such as a physician, or has an important event, she uses an ASL interpreter. She completed high school and took some community college courses using an interpreter. She previously worked at Wal Mart as a stocker and would communicate with her coworkers using notes. Burke is married and has children. Her husband is also deaf but her children are hearing. The family communicates using ASL.

Burke was charged with a misdemeanor child neglect charge in Case No.

---

[11]A drawing signed by "Shawn Vigil" was apparently found in Vigil's cell and depicts a man standing against a brick wall with tears on his face. Exh. 37 to Plaintiff's Response, ECF No. 229-38 There is no evidence that anyone saw this picture before Vigil's suicide.

2004M201587 in Arapahoe County, Colorado. She pleaded guilty to the charge and received a twelve-month deferred sentence which required her to complete parenting classes. Because she failed to attend some of the classes, a warrant was issued for her arrest on June 19, 2007. On August 29, 2007, Denver police officer Joseph Merino and another officer were at the Burke home to do a welfare check on the family. The officers determined the living conditions in the home were adequate but Officer Merino called to check on any outstanding warrants for Burke or her husband. He learned of the Arapahoe County warrant and arrested Burke.

Burke has Type I diabetes. When the police officers arrived, Burke was cooking dinner for her family. She had given herself an insulin shot around 4:30 p.m. but had not yet eaten.

During the welfare check and arrest, Officer Merino communicated with Burke by writing notes and by having her oldest child do sign language interpreting. Burke testified in her deposition that she wrote him a note saying not to use her child to interpret and that she wanted a sign language interpreter. Officer Merino denies that Burke or her husband asked for an interpreter. Burke asked in writing what was going on and an officer wrote "contempt of court." Burke testified that she did not understand what that meant.

Officer Merino stated that it is his usual practice to permit persons arrested to bring their medications with them upon request. However, Burke and her husband provide evidence that her husband attempted to give Burke's insulin and other diabetes medication and aids to Burke or the officers and the officers refused to permit these aids to be taken. They also did not permit Burke to bring her "Sidekick," a device that can be used to send text messages.

Burke was transported to a Denver police substation. While there, a police officer approached her and used some sign language. She could not effectively respond, however, because she was handcuffed and was unable to communicate that she needed to use the restroom and needed food. She was then taken to the PADF. She arrived at the PADF at approximately 9:19 p.m. on August 29, 2007. The booking process at the PADF at the time involved a deputy sheriff collecting relevant information from the detainee or arresting officer or documents, including identifying information and medical issues. A charge slip is given to the detainee showing the charge and bond amount; the detainee is also given a copy of the charges upon which they are being held. The detainee is then screened by medical staff.

Burke testified in her deposition that upon arrival at the PADF, as soon as she received writing materials, she wrote that she needed a sign language interpreter, to eat, and to see a doctor. No sign language interpreter was provided. Burke was seen by a nurse for a medical screening at approximately 10:00 p.m. The "Denver Sheriff Department Medical Services - Admission Assessment Record" notes the following:

> CLIENT IS DEAF. CLAIMS IDDM. WRITES WELL/LEGIBLY.
>
> IN HER WRITING, SHE SAYS SHE TOOK INSULIN AT APPROXIMATELY 16:30 PRIOR TO DINNER AND THEN WAS ARRESTED BEFORE SHE COULD EAT. CLAIMS INSULIN & "A MED FOR PROTECTING HER KIDNEYS." CALLED DR. CRUM RE: BS. TOLD TO GIVE 5 UNITS REG INSULIN NOW WITH SACK LUNCH AND PROCEED AS WE NORMALLY DO PER PROTOCOL.

Wilson Aff. Attach. 6, Exh. A-7 to Denver's Mot. for Summ. J., ECF No. 197-10.

Burke testified that she again asked for a sign language interpreter but the request was ignored. The nurse tested Burke's blood sugar; Burke thought that the nurse had

14

difficulty with the blood sugar monitor and that the monitor was old. According to Burke, she saw that the monitor read a blood sugar level of 28. The medical form shows that the result was 377. Although the nurse noted in the form that he was directed to give Burke a sack lunch,[12] Burke states that she did not receive any food and was told that she would not receive a meal until the 4:30 a.m. breakfast. She asserts that she also wrote to the nurse that she did not want insulin because she needed food and more insulin would make things worse.

Burke posted a bond on August 29, 2007 at 10:36 p.m. Burke was released from the PADF at approximately 2:00 a.m. At her release, Burke again requested a sign language interpreter in writing, but the deputies indicated that she needed to sign some paperwork and that she could go. She was given the opportunity to use a TDD. However, Burke states that the equipment did not work. Moreover, her home does not have a TDD. She also requested assistance from the officers in helping her to contact her husband but they did not help her other than to show her the TDD. She was given bus tokens by a deputy sheriff. Although her husband had called the facility to say that he was on his way to pick her up, that message was not relayed to Burke. There is a waiting area in the lobby of the facility. Burke did not notice it and attempted to get herself home on her own. She found a light rail station but the trains were not yet running. She accepted a ride from a passerby, who then wrote her a note saying they would "have fun." She managed to get out of the vehicle and got herself to a light rail station. Trains were running at this point and she returned home, arriving at approximately 5:30 a.m. She testified that she began

---

[12]Sack lunches were kept in a refrigerator in the nurses' station to provide to inmates who needed one.

experiencing symptoms of hypoglycemia at the police station that worsened through the night.

Plaintiff Roger Krebs

Plaintiff Roger Krebs has been deaf since he was eighteen months old. He communicates using ASL with his family; his children are hearing. He can communicate in writing but uses simple words and if the writing is too long he does not understand it. He does not lip read. He took some college classes at a school for the deaf. He is currently employed at Fort Carson; his job is to open UPS deliveries and distribute them. He communicates with his supervisor through notes or with the assistance of a coworker who knows some sign language. He communicates with his coworkers using notes or gestures but states that his job is routine and simple and requires little in the way of communication. If there is a workshop or training his employer arranges for a sign language interpreter. He previously worked at the Air Force Academy as a library tech fixing book bindings. He has a computer at home and uses email.

Krebs was arrested by Denver police on March 29, 2007 at approximately 10:40 p.m. He was at the Greyhound Bus Station in Denver when a security guard told him that he had to move. According to Krebs, he was sitting on the floor charging the battery on his "Sidekick" device. A guard came up to him and gestured for him to move. Krebs indicated he is deaf. The guard tried to grab his Sidekick and Krebs pulled it back away from him. The guard then grabbed Krebs' neck and Krebs bit him because he was being choked. The security guard's version of events differs somewhat. According to the security guard, he wrote Krebs a note saying he had to move but Krebs refused to move. The security guard then tried to move Krebs and Krebs bit him. It is undisputed that there was a scuffle.

Krebs testified in his deposition that the guard pushed him down and pounded his head. At some point, Krebs fell and injured his ankle. The security guard subdued him and handcuffed him tightly.

Another security guard and a police officer came over. The officer tried to stand Krebs up but he kept falling because of his injured ankle. Krebs was taken to a security room at the bus station. The police officer noticed that the handcuffs were too tight and the cuffs were loosened. The police officer then gave Krebs a document to read but Krebs could not read it because his glasses had been knocked off during the scuffle. Even after the glasses were retrieved they were smudged. The police officer charged Krebs with municipal ordinance violations of disorderly conduct, assault and trespass. Krebs wrote a note requesting a sign language interpreter but the officer did not respond. Krebs showed the officer that his foot was purple and swollen and the officer called an ambulance.

Krebs was taken to the hospital, treated for a sprained ankle, and given crutches. At the hospital he was assisted by a sign language interpreter. After treatment, however, he was taken to the PADF and was not provided a sign language interpreter there despite his request. Records show that he arrived at the facility at approximately 3:27 a.m. on March 30, 2007 and was seen by a nurse at approximately 4:30 a.m. The "Denver Sheriff Department Medical Services- Admission Assessment Record" notes that Krebs is "deaf/mute" but should request medication "through writing," that he was on crutches because of a sprained right ankle, and that he "will need to write to communicate or signing interpreter." Wilson Aff. Attach. 3, Exh. A-7 to Denver's Mot. for Summ. J., ECF No. 197-10. Krebs was housed alone at the PADF because of his deafness and because he had

crutches, which could be used to cause injury to him or to others. Krebs was not allowed to keep his "Sidekick" with him pursuant to a general policy at the PADF of prohibiting all cell phones and pagers. He states that he did not understand why he was in jail and wanted to resolve whatever the problem was.

Krebs was arraigned at the County Court of the City and County of Denver on the same day, March 30, 2007. According to the court records, he pleaded guilty to the three counts. The judicial officer's notes provide "Def. is deaf. But can read, advised of rights in writing and plead guilty. 1 day CTS." Exh. A-2 to Denver's Mot. for Summ. J., ECF No. 197-3. Krebs asserts that at the hearing he wrote that he wanted a sign language interpreter but instead was given a written advisement of his rights. He states that he pleaded guilty by circling "guilty" on a piece of paper. He did not understand what was going on but knew that he should not have bitten the security guard. He was told that he if wanted a sign language interpreter he would have to wait three days for another hearing but if he pleaded guilty he could be released immediately. Krebs and the judicial officer communicated by writing notes back and forth. A document in the court file contains the following colloquy:

> [Handwriting 1] Sir:
> You are charged with Disturbing the Peace, Assault and Trespass. Do you wish to Plead guilty or not guilty? ["guilty" is circled].
>
> [Handwriting 2] Because of disobey therefore luck of communication.
>
> [Handwriting 1] Anything else you want to tell me or any questions?
>
> [Handwriting 2] Yes yellowshirt so hard pull out of my neck tight choke even can't understand of communication

[Handwriting 1] 1 day credit time served.  You will be set free.
[Initials]

[Handwriting 2] OK thanks your honor!

Exh. A-2 to Denver's Mot. for Summ. J., ECF No. 197-3.  Krebs was released from the PADF at 7:00 p.m. that day.

<u>Denver's Policies and Training</u>

Denver has made sign language interpreters available 24 hours a day seven days a week upon request by the Police Department and Sheriff Department since the 1990s. Training and arrangements for sign language interpretation for the Sheriff Department are provided by Lori Kosinski.  Ms. Kosinski sends written notice to the Police Department, Sheriff's Department and the Denver County Court explaining how to obtain sign language interpreter services.  There is now a written policy regarding the availability of interpreter services, although it does not appear that such a document existed in 2005.  Ms. Kosinski has held numerous meetings with police and sheriff personnel regarding deaf access issues at the jail and with police.

Ms. Kosinski provides a two-hour session at the Sheriff Department training academy[13] covering topics such as how to obtain and work with a sign language interpreter, terminology about communication with deaf people, descriptions of the deaf and hard of hearing communities, recognizing deafness, and types of communication modes.  Written materials are also provided.  She mentions the Americans with Disabilities Act but does not specifically train on its requirements.  She advises that an ASL interpreter is the best way

_____

[13]She provides a similar training course for the Denver Police Department's training academy.  These classes have been ongoing since at least the 1990s.

to communicate with deaf inmates and that law enforcement officers should not assume that writing is an effective means of communication. She also does not advise law enforcement officers to rely on children to interpret for deaf individuals.

In general, the PADF and Jail do not have any policies regarding how to determine and document a deaf inmate's preferred means of communication. There is no policy regarding saving notes passed between deaf inmates and deputies or staff. None of the employees who had interactions with the detained Plaintiffs had a method or practice of ensuring that written or other communication with a deaf inmate was effective, and the representatives of Denver, other than Ms. Kosinski, were unaware of any training in this regard. The deputies interviewed generally were unaware that they could not necessarily rely on a deaf inmate's ability to read or write in communicating with that inmate. No special training is provided to intake deputies regarding screening or classification issues with deaf inmates. There is no mandatory ongoing training regarding deaf inmate issues, although sign language instruction is offered to interested law enforcement officers and staff. While some deputies may know some sign language, there is conflicting evidence as to whether there is a list of such deputies as an available resource.

There are two TDDs at the PADF: one in the sergeant's office and one in the lobby. There is evidence that there is a sign posted at the PADF informing inmates of the TDD. Inmates at the PADF have access to a telephone twice daily, including to the TDD. A videophone for deaf inmates was installed at the PADF in 2008. There are no televisions at the PADF. As noted above, the Jail has a TDD in the sergeant's office. There is no specific policy regarding how deaf inmates would be informed of the availability of accommodations for communication, such as the TDDs or sign language interpreters, and

the Jail's 2005 inmate handbook does not reference them.

The Sheriff Department, and the Jail specifically, have suicide prevention policies and deputies were expected to know and follow them. The Jail's general post order, which is undated, notes that high risk periods include after booking, after receiving bad news, including the prospect of or imposition of a long sentence, court hearings, or after suffering some type of humiliation or rejection. Romero Aff. Attach. 6, Exhibit A-5 to Denver's Mot. for Summ. J., ECF No. 197-8. The policy advises that inmates displaying unusual behavior should be monitored and housed with another resident if possible. *Id.* The policy further notes that "making rounds and logging rounds are essential." *Id.* Officers are reminded that suicides may be prevented if officers are caring and that many inmates "just need someone to talk to." *Id.* Officers are warned that if they ignore obvious signs of suicidal intent they could be legally liable if the inmate commits suicide. *Id.* The Sheriff's Department Order Number 5410.1, effective date February 24, 1997, recites that "[i]t is the policy of the Denver Sheriff Department that all staff responsible for inmate supervision are trained in the implementation of a suicide prevention program." Romero Aff. Attach. 6, Exhibit A-5 to Denver's Mot. for Summ. J., ECF No. 197-8. The Order identifies signs of a suicidal inmate, including statements regarding suicidal intent or history, depressed appearance or discussion of recent losses, physical indications of past suicide attempts, a significant sentence or general despondency over his charges or case. *Id.* The Order provides that the intake process should include a screening for suicidal inmates and that medical staff will determine appropriate housing and referrals. *Id.* Procedures for suicide watch are set forth, as are procedures for responding to a suicide attempt. *Id.*

Deputies are trained in suicide prevention at the academy, although there is no

ongoing or additional training other than what is contained in the written policies. There is no specific or different training regarding suicide prevention for deaf inmates. Deputies are trained and expected to know that suicide is a particular risk at jails and detention facilities, and that feelings of isolation or seclusion can increase the risk.

One deputy responsible for Vigil whose deposition was taken showed that he knew that high risk periods included holidays, booking and court dates, sentencings, and after getting bad news from home and family. He also knew of warning signs, such as withdrawal. Another deputy who was on duty on Vigil's tier could not name risk factors when asked in his deposition.

Representatives of the Sheriff Department stated that the mental health screening process is an important aspect of suicide prevention. Jail deputies in general do not have information about mental health needs of inmates or access to their mental health or medical records. They also do not generally know about an inmate's charges or potential sentence or personal information such as birthdays.

DHHA provides nursing staff on site at both the PADF and the Jail and has physicians and psychiatrists available on call. DHHA trains deputies at the academy regarding the proper response to inmate medical problems and how to recognize common acute presentations.

In the Second Amended and Supplemental Complaint (ECF No. 48), which governs at this time, the following claims are asserted: (1) violations of Section 504 of the Rehabilitation Act, against Denver; (2) violations of the Americans with Disabilities Act ("ADA") against Denver; (3) 42 U.S.C. § 1983 claim asserted by Plaintiff Ulibarri and the Estate for violations of the Eighth and Fourteenth Amendments against all Defendants

(individual and official capacity); (4) 42 U.S.C. § 1983 claim asserted by Plaintiff Ulibarri, the Estate, and Plaintiff Burke for state created danger against all Defendants (individual and official capacity); (5) denial of due process for failure to train and/or supervise against all Defendants (individual and official capacity); (6) denial of due process, special relationship, asserted by Plaintiffs the Estate, Krebs, and Burke against all Defendants (individual and official capacity); (7) state negligence claim asserted by Plaintiff Ulibarri and the Estate against Denver; (8) state wrongful death claim asserted by Plaintiff Ulibarri against Denver; (9) state negligence claim for failure to train and supervise asserted by Plaintiff Ulibarri and the Estate against Denver.

A.      Objections to Orders of Magistrate Judge

I first address the two Objections to the orders of Magistrate Judge Watanabe. On non-dispositive matters, I may modify or set aside any portion of a magistrate judge's order that I find to be clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a).

On August 18, 2008, Magistrate Judge Watanabe entered an order (ECF No. 76) denying Plaintiffs' Motion to Compel Discovery Responses (ECF No. 57). In their motion, Plaintiffs requested fuller responses to Interrogatories 5, 6, 10, and 11, unredacted versions of several documents, and complete interrogatory responses signed under oath by the defendants to whom they were directed. Magistrate Judge Watanabe ruled that Interrogatories 5, 10, and 11 were overly broad and no further response was required; Interrogatory 6 was fully answered by Defendants with information after reasonable inquiry and no further response was required; and the unredacted versions of the documents at issue, which were reviewed by Magistrate Judge Watanabe *in camera*, fall within the official information privilege and did not need to be disclosed.

Plaintiffs filed a timely Objection (ECF No. 80) arguing that the information at issue is critical to their case and that the order was clearly erroneous and contrary to law. I have reviewed the interrogatories at issue and see no clear error in Magistrate Judge Watanabe's determination. The interrogatories were either answered or were overbroad and/or unduly burdensome. Although Plaintiffs attempted to limit the scope of the requests by narrowing the discovery sought, this does not demonstrate that the Magistrate Judge's decision regarding the interrogatories as propounded was in error.

With respect to the documents, it appears that Plaintiffs' attorneys were permitted to read but not to make copies of the unredacted documents. Plaintiffs make no argument that the documents do not fall within the official information privilege but rather argue that "the concerns evinced by Defendants could have easily been addressed through a protective order" and contend that Magistrate Judge Watanabe did not go through a ten-factor balancing analysis to determine whether the interests of disclosure outweigh the interests of the government entity asserting the privilege. However, Plaintiffs have not shown that Magistrate Judge Watanabe's ultimate conclusion, that the redactions at issue here are privileged, was clearly erroneous or contrary to law. Accordingly, Plaintiffs' objection is overruled.

The second order was entered November 10, 2008 (ECF No. 104). In it, Magistrate Judge Watanabe addressed Plaintiffs' Second Motion to Compel Discovery Responses (ECF No. 90) and Plaintiffs' Motion to Amend Scheduling Order (ECF No. 91). In the motion to compel, Plaintiffs sought the production of the personnel and internal affairs files for 60 individuals identified in Defendants' initial disclosures and further sought responses to discovery requests that Defendants refused to respond to on the grounds that the

Plaintiffs had exceeded the limits in the Scheduling Order. In the motion to amend, Plaintiffs sought to amend the Scheduling Order to provide for fifty additional depositions, ten additional interrogatories, and ten additional document requests, and to continue discovery for four more months. Magistrate Watanabe denied the request for the files as overly broad and because Plaintiffs had not established that the personnel and other files were reasonably calculated to lead to the discovery of admissible evidence or that a compelling interest justified the intrusion. Magistrate Judge Watanabe also found that Plaintiffs had exceeded the number of discovery requests permitted by the Scheduling Order but that the Defendants' objections in this regard were overruled. Therefore, unless another objection was presented, Defendants were ordered to respond to the discovery requests. Magistrate Judge Watanabe determined that the Plaintiffs had not shown good cause for their request for additional discovery, particularly since Plaintiffs had already been given lengthy extensions to the original deadlines. However, an extension of time was granted for expert disclosures.

In their Objection (ECF No. 113), Plaintiffs appear to object only to the portion of the order denying them fifty additional depositions. Plaintiffs argue that this order was erroneous because Defendants had disclosed a number of witnesses without specifically identifying the subject of their knowledge or testimony. In response, Defendants argue that Plaintiffs were not diligent with respect to this issue. Defendants point out that Plaintiffs previously sought to amend the Scheduling Order after disclosure of many of these witnesses but did not seek additional discovery. In addition, Defendants argue that information about the witnesses is readily discerned through the documents produced and other discovery. I agree with Defendants and conclude that Plaintiffs have not

demonstrated that Magistrate Judge Watanabe's denial of these additional depositions was clearly erroneous or contrary to law. Again, Plaintiffs' objection is overruled.

B.    Motions to Strike

1.    Plaintiffs' Motion to Strike

In their Motion to Strike (ECF No. 224), Plaintiffs request that I strike or disregard certain evidence submitted by Defendants with the Defendants' Motions for Summary Judgment, specifically: (1) statements that constitute expert testimony under FRE 702 from witnesses that Defendants did not designate pursuant to FRCP 26(a)(2); (2) statements that are not made on personal knowledge; (3) statements that contradict testimony from witnesses designated by Defendants pursuant to FRCP 30(b)(6); and (4) hearsay. I will address each general category of objections.

Plaintiffs assert that evidence offered in the form of affidavits, specifically the Affidavit of Peter Crum, M.D. (Exh. A-6, ECF No. 197-9), Affidavit of John Romero (Exh. A-5, ECF No. 197-8), and Affidavit of Gary Wilson (Exh. A-7, ECF No. 197-10), contain statements that amount to expert opinions but that these witnesses were not offered or disclosed as experts. I conclude that the only statements that should be disregarded or stricken are Paragraphs 17 and 19 of Dr. Crum's affidavit in which he opines that the "routine multiple daily nursing rounds and the weekly nursing round for inmates in Special Management provided ample opportunity for Vigil to receive medical attention" and that after review of Vigil's file "there was no evidence of high risk behavior by Vigil that would be a warning sign of suicide, and that his suicide was not preventable." ECF No. 197-9. The first statement, regarding whether Vigil had sufficient opportunity to obtain medical care, is a central question in dispute and so I do not consider this to be a statement of

26

"undisputed" fact. The second, concerning whether Vigil's suicide was preventable, appears to require specialized knowledge by a witness qualified by knowledge, skill, experience, training, or education under FRE 702. Since Dr. Crum was not disclosed as an expert in any relevant area, such as psychology or medical training on detection of suicide risks, these opinions will be disregarded.

The remaining statements at issue do not appear to involve opinions but rather are simply descriptions of events and routine practice concerning communications between inmates at the PADF and DCJ. I do not read the statements as containing any kind of opinion regarding the quality or effectiveness of the communication in general or as specifically applied to the deaf individuals involved in this litigation. Therefore, I will not strike these statements.

Next, Plaintiffs seek to exclude portions of the same affidavits on the grounds that the affiants do not have sufficient personal knowledge or because the affidavits contain conclusory statements. I disagree. I have reviewed the depositions and affidavits of these witnesses and am satisfied that the individuals whose affidavits are offered have adequate personal knowledge of the matters that they are describing. Accordingly, I do not exclude any other statements in these affidavits on this basis.

Plaintiffs seek to strike a significant portion of the affidavit of Dr. Crum to the extent it conflicts with the testimony of Denver's Fed. R. Civ. P. 30(b)(6) designees. Dr. Crum provided the affidavit as a representative of the DHHA; the affidavit concerns the practices of the DHHA in providing medical services to the PADF and the Jail. The evidence Plaintiffs seek to strike primarily concerns the routine practices at the Jail in 2005, particularly with respect to the nurses making rounds. I see no conflict with the testimony

of the official designees, who for the most part could not testify about the provision of medical services because those services are provided by DHHA. Plaintiffs apparently did not seek to take a 30(b)(6) deposition of DHHA.[14] Because there is no conflict, I will not strike the contested portions of Dr. Crum's affidavit.

Finally, Plaintiffs seek to strike any inadmissible hearsay contained in the affidavits. Several of the affidavits reference attached documents and restate their contents. *See, e.g.*, Crum Aff., Exh. A-6, ECF No. 197-9, ¶ 16 (discussing Vigil's medical records). To the extent that the affidavits provide context for the documents, I will deny the motion. To the extent the affidavits restate or interpret the documents, I will grant the motion and will consider only the documents themselves. Accordingly, the motion is granted with respect to Paragraph 16 of Dr. Crum's affidavit and Paragraphs 19 and 20 of Mr. Romero's affidavit to the extent that the affiants restate or interpret the contents of the referenced documents.

2.    Defendants' Motion to Strike Exhibits

In their Motion to Strike Exhibits in Plaintiffs' Combined Response to Summary Judgment (ECF No. 243), Defendants seek to exclude certain exhibits submitted by Plaintiffs in their Response to the two Motions for Summary Judgment. Specifically, Defendants request that I disregard evidence that amounts to inadmissible hearsay, documents not properly authenticated, and evidence that is inadmissible as irrelevant.

Defendants' objections based on authentication are overruled in that it appears that all of the contested evidence can be authenticated and indeed Plaintiffs provided

---

[14]It may be that Plaintiffs believe that Denver should have designated a representative of DHHA to testify on certain topics. While the designation of a nonparty representative is theoretically permitted under Rule 30(b)(6), the nonparty must consent to do so, and Plaintiffs have not shown that this occurred.

authentication in their response to the motion to strike. As to the remaining issues, I rule as follows:

Exhibit 9,[15] McCarten Aff. ¶ 5: hearsay objection is overruled, not offered for the truth of the matters asserted and/or admission of a party opponent.

Exhibit 17, Krebs Aff. ¶¶ 8, 15, 16: hearsay objection is overruled, not offered for the truth of the matters asserted.

Exhibit 20, excerpts of recording: hearsay objection is overruled as record of regularly conducted activity.

Exhibit 22, educational records of Shawn Vigil: hearsay objection is overruled as record of regularly conducted activity.

Exhibit 24: document/letter concerning another case: relevance objection granted, evidence regarding Nurse Costin's conduct in a later-occurring case is immaterial to the issues here.

Exhibit 25: document/letter concerning another case: relevance objection granted.

Exhibit 31: photos of Vigil's cell: relevance objection overruled as Plaintiffs have provided substitute photos with proper authentication.

Exhibit 32: notes of Shawn Vigil: hearsay objection overruled, not offered for the truth of the matters asserted.

Exhibit 41: report from U.S. Dept of Justice concerning facility operated by Defendants' expert witness: relevance objection overruled, hearsay objection overruled as record of regularly conducted activity.

---

[15]This exhibit is duplicated as Exhibit 30.

Exhibit 57, Aff. Of Julie Reiskin ¶¶ 6-12, 15, 19-21: lack of personal knowledge objection overruled, affiant has shown that she has personal knowledge of the matters stated in the affidavit..

Exhibit 58, Aff. Of Jennifer Pfau: objection that Pfau is not authorized to make statements on behalf of the CAD is overruled; Defendants have not shown that declarant's statement that she is able to speak for the organization is incorrect; objection based on lack of personal knowledge objection overruled as affiant has shown that she has personal knowledge of the matters stated in the affidavit..

C.     Motions for Summary Judgment

Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Discussion

1.     Claims 1 and 2: Violations of the Rehabilitation Act and ADA

Denver moves for summary judgment on Plaintiffs' Claims 1 and 2 on numerous grounds. Denver does not dispute, for the purposes of summary judgment, that Vigil, Burke, and Krebs are qualified individuals with a disability for the purposes of the ADA or the Rehabilitation Act due to their deafness. However, Denver argues that any claims concerning Vigil can only be asserted for conduct occurring after August 28, 2005 because of a two-year statute of limitations. Denver further argues that any claims concerning the arrests of these individuals are barred because the ADA and Rehabilitation Act do not apply

to arrests and/or because the failure to provide sign language interpreter during the arrests did not amount to discrimination. Denver then contends that the conditions of these individuals' detentions were not discriminatory under the ADA and Rehabilitation Act.

Section 504 of the Rehabilitation Act prohibits discrimination against the disabled by recipients of federal funding. 29 U.S.C. § 794. Denver does not deny that it is subject to the Rehabilitation Act. To establish a *prima facie* case of discrimination under the Rehabilitation Act, a plaintiff must demonstrate that he or she is handicapped under the act, is otherwise qualified to participate in the program, the program receives federal financial assistance, and the program discriminates against the plaintiff. *Barber ex rel. Barber v. Colo. Dep't Of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009). To recover compensatory damages under section 504, a plaintiff must establish that the agency's discrimination was intentional; this does not require "a showing of personal ill will or animosity toward the disabled person; rather, 'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Id.* at 1228-29 (citation omitted); *see also id.* at 1229 (deliberate indifference requires two elements: (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that ... likelihood.") (citation omitted).

Title II of the ADA prohibits discrimination against the disabled by public entities. 42 U.S.C. § 12132. Again, there is no dispute that the PADF and Jail are subject to the ADA. In order to state a Title II claim, a plaintiff must demonstrate that he or she is a qualified individual with a disability; he or she was excluded from participation or denied the benefits of a public entity's services, programs, or activities; and such exclusion, denial of benefits,

31

or discrimination was because of the individual's disability. *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). As with the Rehabilitation Act, the Tenth Circuit appears to require a showing of intentional discrimination before a plaintiff may recover compensatory damages for mental or emotional injury. *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403-4 (10th Cir. 1997).

      a.    <u>Arrests</u>

I first examine whether the arrests of Vigil, Krebs, and Burke violated the ADA and Rehabilitation Act. Vigil was arrested on August 17, 2005 and the first complaint in this case was filed August 28, 2007. There appears to be no real dispute that a two-year statute of limitations applies to ADA and Rehabilitation Act claims. *Quinn v. Univ. of Okla.*, 276 Fed. Appx. 809, 810-811 (10th Cir. 2008) (unpublished); *Hughes v. Colo. Dep't of Corr.*, 594 F. Supp. 2d 1226, 1235 (D. Colo. 2009). Therefore, any claim based solely on Vigil's arrest is time-barred.

Denver cites *Rosen v. Montgomery County, Maryland*, 131 F.3d 154, 157 (4th Cir. 1997) for the proposition that a police arrest is not a "service, program, or activity" for which Title II of the ADA applies. However, as noted by Plaintiffs, the Tenth Circuit has observed, without adopting a similar rule, that other jurisdictions recognize disability discrimination claims in arrests based on the theory that the law enforcement officers "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999) (citing *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998)). Because the plaintiff in *Gohier* did not argue a failure to reasonably accommodate theory similar to *Gorman*, the Tenth Circuit did not opine on whether such

a theory would apply in that case. 186 F.3d at 1222 ("this court merely clarifies that a broad rule categorically excluding arrests from the scope of Title II . . . is not the law"). Plaintiffs also cite *Hainze v. Richards,* 207 F.3d 795 (5th Cir. 2000) for the proposition that when police respond to criminal activity or a disturbance, law enforcement officers are under a duty to reasonably accommodate an arrestee's disability in handling and transporting the individual, assuming the area is secure and there is no threat to safety. 207 F.3d at 801-802.

I find the reasoning in *Gorman* and *Hainze* to be persuasive and will assume for the purposes of summary judgment that the Tenth Circuit would recognize a failure to reasonably accommodate theory during an arrest and examine whether Burke and Krebs can state a claim. I conclude that Krebs cannot demonstrate that he suffered "greater injury or indignity" than other arrestees in the arrest process because of the lack of a sign language interpreter. He described a certain amount of indignity with respect to his arrest, but this conduct came from the private security guard, not the Denver police officer. In Krebs' deposition, he stated that the police officer was a "nice guy" and that the officer slowly and carefully said things like "calm down" and "take it easy" that Krebs could understand. Krebs Dep., Exh. A-16 to Denver's Mot. for Summ. J., ECF No. 197-19, 70. Krebs was able to obtain medical attention for the injuries he incurred as a result of the scuffle with the guard. He was given a document with the charges and while he claims difficulty reading, it was apparently because of his glasses, not his reading ability. Although he did not fully understand why he was being arrested, he knew it had to do with biting the guard. Overall, I conclude that there is no genuine issue of fact regarding his arrest and that he did not suffer discriminatory injury or indignity during his arrest because of his

disability.

Burke, on the other hand, has alleged facts which, if credited by a jury, could support a claim of disability discrimination in the course of her arrest. There is evidence that she did request a sign language interpreter and that there was some failure of communication with the police officers who effected her arrest. Specifically, despite the officer's stated practice of permitting arrestees to bring their medication, Burke was not permitted to take diabetes medication and aids with her. There is evidence to indicate that both she and her husband attempted to convey that she needed these items but that, because of her disability, the officers did not understand her medical needs. As a result, a significant period of time passed before she saw a medical professional to assist her. Burke testified that she became hypoglycemic while waiting to be seen by the nurse and suffered avoidable discomfort as a result of the failure in communication. In addition, although arrestees are not permitted to have pagers and telephones at the detention facility, it does not appear that there is any policy against permitting these items during an arrest. Accommodating Burke's disability by permitting her to retain her "Sidekick" device as a communication aid during her arrest could have decreased the difficulty she had in comprehending or obtaining assistance for her medical needs and in obtaining transportation after her release. Accordingly, I conclude that summary judgment is not appropriate on Burke's ADA and Rehabilitation Act claim to the extent it is based on her arrest.

b. <u>Detention</u>

There is no dispute that disabled individuals are entitled to reasonable accommodations during detention or incarceration. *Robertson*, 500 F.3d at 1194-95. This

means that the PADF and Jail were required to provide "meaningful" access to their programs and services for disabled detainees. *Id.* at 1195. To effectuate the mandate of the ADA, public entities must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." *Id.* (quoting 28 C.F.R. § 35.130(b)(7) and noting that "reasonable modifications" is understood to be equivalent to "reasonable accommodation" in the ADA's employment provisions). This means that the entity should take steps to ensure that communications with disabled detainees are as effective as communications with others and that appropriate auxiliary aids and services are provided as necessary. 28 C.F.R. § 35.160(a) &(b)(1). "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." 28 C.F.R. 35.160(b)(2). However, if an individual's disability or the need for an accommodation is obvious, the failure to expressly request a specific accommodation is not fatal to an ADA claim. *Robertson*, 500 F.3d at 1197 n. 10 ("Whether the public entity's knowledge derives from an individual's request for an accommodation or an individual's obvious need for an accommodation, the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services."). A public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Robertson*, 500 F.3d at 1196; 28 C.F.R. § 35.164.

With respect to the detentions, Plaintiffs allege numerous actions that amount to discrimination: isolating them because of their disability; failing to provide sign language

interpreters; depriving them of essential devices or equipment (i.e., TDDs, video phones, closed captioned programming); not permitting Burke to use her personal diabetes medication at the PADF and not giving her access to food, water, or bathroom breaks; and failing to provide Krebs with a sign language interpreter at his arraignment. I will address each detainee in turn.

Denver argues that Vigil never asked for a sign language interpreter while he was incarcerated and that there is no evidence of lack of effective communication between Vigil and the Jail staff during his initial screening. As a preliminary matter, I conclude that any claim for failure to accommodate during Vigil's booking is time-barred as it occurred on August 25, 2005, and, as noted above, the original complaint in this case was filed August 28, 2007.

However, I conclude that there are issues of fact regarding whether Vigil had access to the Jail's services after he was booked and placed in his housing assignment to the same extent as inmates who could communicate verbally. There are issues of fact as to whether Vigil had access to TDD at the Jail. Although Denver has provided evidence that the Jail had these devices, Ms. Ulibarri testified that she was told by the Jail that they had no equipment for her to communicate with her son. I conclude that there are also issues of fact as to whether Vigil had meaningful access to the services when he may not have been able to read the inmate handbook and, even if he could, the inmate handbook did not inform him of the availability of TDD or sign language interpreters so that he could request them. Plaintiffs have presented evidence sufficient to show that the Jail's services, including opportunities for interaction with medical staff, may have been limited in effectiveness to Vigil without the assistance of a sign language interpreter. Moreover, a

jury could find that there was a failure to determine whether Vigil could access the Jail's services without assistance. Given that his disability was obvious, the question of whether the Jail therefore should have known of effect of the disability on Vigil's ability to participate in the Jail's programs and services should go to the jury.

Turning to Burke, I see no discrimination in the failure to provide Burke with a sign language interpreter during the intake process at the PADF. The governing regulations provide that a public entity "shall honor the [disabled person's] choice [of accommodation] unless it can demonstrate that another effective means of communication exists." Preamble, 28 C.F.R. pt. 35, app. A, Section 35.160 General. It is apparent from the medical record that she adequately was able to communicate her medical needs and her current status regarding her insulin intake and need for food. Therefore, I conclude that writing was an equally effective means of communication in this process. If the nurse failed to provide food as directed by the physician it would not be because of the lack of a sign language interpreter but some other oversight or error. Any alleged problems with the blood sugar monitor or direction to give her more insulin also does not reflect inadequate communication. The Plaintiffs have not identified any errors in the booking process or otherwise that would indicate that some essential communication assistance was needed but not provided.

However, the problems Burke had upon release, including being unable to communicate with her husband to take her home, could demonstrate a failure to accommodate her disability. The evidence shows that her assistive communication device had been taken away at the time of her arrest, the PADF's PDD was not functional, and whoever staffed the release area was unwilling to assist her to make contact with her family

using a computer or telephone.  Under these circumstances, she was not in the same position as a hearing person who could have used a telephone to contact family members for a ride home and so did not have the same access to the entity's services as non-disabled persons.  Therefore, I conclude that summary judgment should not enter on  her disability discrimination claim to the extent it is based on her treatment at the PADF.

Plaintiffs also argue that Defendants failed to reasonably accommodate Burke's disability of diabetes in her arrest.  Defendants dispute that Burke's diabetes is a "disability" as defined by the ADA and Rehabilitation Act.  Plaintiffs have not made a showing in this regard.  I need not determine this issue, however, as I have already concluded that the question of whether Burke was discriminated against in the course of her arrest and detention should be determined by a jury.  Similarly, even though there is a factual dispute regarding whether Burke actually received food while at the PADF, it is clear that the nurse was ordered to do so and so I conclude that the oversight, if it occurred, does not demonstrate disability discrimination but rather simply negligence.

Finally, I examine whether Krebs has provided evidence to demonstrate that he was discriminated against based on his deafness during his detention.  I see no failure of effective communication with respect to the booking and screening of Krebs at the PADF.  There is no indication that any error occurred on his medical screening or that a classification decision occurred that led to any injury that would have otherwise not occurred.  Because he had crutches, it was reasonable to house him alone.

The failure to provide him with a sign language interpreter at his arraignment, however, is somewhat more problematic and I conclude that *Robertson* is on point.  In *Robertson*, the plaintiff was deaf but had a cochlear implant that permitted him to hear

voices when the person speaking faced him from a short distance. The plaintiff was arrested and detained and eventually had a probable cause hearing at the detention facility, where he could only participate by closed-circuit television. Although he had an attorney present, he could not hear what was going on. The charges were dismissed. Nonetheless, the Tenth Circuit decided there were issues of fact regarding whether his need for accommodations was obvious. Moreover, the court held that the plaintiff's "injury" was that he "was denied the ability to participate in his probable cause hearing to the same extent as non-disabled individuals." 500 F.3d at 1199.

Here, Krebs does not deny that he bit the security guard and does not appear to seek to overturn his conviction on the resulting charges.[16] Nonetheless, the evidence presented is sufficient for a jury to find that he was denied the opportunity to participate in his arraignment to the same extent as non-disabled individuals. The written colloquy with the judicial officer, although adequate to show that Kreb knowingly pleaded guilty to the charges, demonstrates that he could not communicate with the judicial officer regarding the events that occurred. Having read Krebs' deposition, which was conducted with the assistance of a sign language interpreter, I believe that he was attempting to explain why he bit the security guard. However, a jury could find that the words on the paper would not have been understandable to the judicial officer at the hearing and that Krebs therefore was not given the opportunity to explain himself or understand the process as well as someone without his disability. Therefore, I will deny summary judgment on this claim.

_____

[16]Denver argued that Krebs' claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) to the extent that it is based on his court hearing and guilty plea. However, I see no indication that Krebs seeks to invalidate his conviction or argues that his guilty plea was not knowing and voluntary and so I do not consider the effect of *Heck* in this order.

c.      Availability of Damages and Injunctive Relief

Denver argues that even if Plaintiffs can establish a *prima facie* case of disability discrimination, they should not be permitted to seek compensatory damages because they cannot prove intentional discrimination.  I conclude there are sufficient issues of fact to preclude summary judgment in this regard.  Although it appears that Denver makes efforts to train its deputies and staff on disability issues, including those affecting deaf individuals, there is evidence sufficient for a jury to find that these efforts are insufficient.  It appears that there are gaps in deputies' knowledge of how best to communicate with deaf inmates as well as how and under what circumstances to obtain an interpreter.  Although assistive devices are available, they are of questionable value if inmates have no way to learn of them or if they are inoperable.  Therefore, I will not bar Plaintiffs' request for compensatory damages at this time.

Denver argues that the claims for injunctive relief are moot because Vigil is deceased and Burke and Krebs have been released.  Plaintiffs respond that the entity Plaintiffs, the CCDC and CAD, have standing to seek injunctive relief and these claims are not moot.

The entity Plaintiffs present evidence that they are impacted by Denver's failures to provide adequate accommodation for deaf and other disabled arrestees, detainees, and inmates because these organizations receive and investigate complaints from disabled individuals coming in contact with Denver's Police and Sheriff Departments.  Therefore, the entities argue, they are required to expend time and resources attempting to obtain redress on behalf of their members and the community they serve.

To establish standing for injunctive relief, a plaintiff must show that:

> (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested.

*Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)).

Denver first challenges the admissibility of the organizations' evidence regarding their injuries. As discussed in the section of this order concerning the motions to strike, I disagree with Denver and consider Plaintiffs' evidence to be adequate and admissible. Denver then further argues that Plaintiffs have not established that the CCDC and CAD may bring associational claims on behalf of their members. Under Tenth Circuit law, an association has such standing only if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). However, Denver made this argument for the first time in its reply brief, and arguments raised for the first time in a reply may be disregarded.[17] *Hill v. Kemp*, 478 F.3d 1236, 1250 (10th Cir. 2007); *United States v. Murray*, 82 F.3d 361, 363 n. 3 (10th Cir.1996). Moreover, it appears to me that the organizations are bringing their claims on their own behalf not exclusively on behalf of

---

[17]Nonetheless, since standing is essential to the assertion of the claims, Defendants are not precluded from raising this issue again.

their members.

I will not dismiss the injunctive claims as moot.  I conclude that the organizational Plaintiffs have established that they have suffered a concrete and particularized injury traceable to the alleged conduct of Denver and its agencies.  Further,  there is adequate evidence that the injury is actual and likely to recur in the future and can be redressed by the relief requested.  There is significant disputed evidence regarding the current existence and effectiveness of the accommodations for deaf detainees and inmates at the PADF and Jail.  For example, at least one deputy was still unaware of any policy regarding the availability of sign language interpreters.  Similarly, there is evidence that the PDD at the PADF was not operational at a visit during the pendency of this litigation.  Accordingly, it is reasonable to infer that other deaf persons detained will have some of the same difficulties as the detained Plaintiffs here.  Because the organizational Plaintiffs have shown that this will require them to expend further resources, I conclude they have adequately demonstrated their standing to seek injunctive relief.  *See, e.g., Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (in Fair Housing Act case, "an organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular housing discrimination in question.").

2.    Claims 3 - 6: Constitutional Claims pursuant to § 1983

Plaintiffs assert several constitutional claims against Denver and the individual Defendants; they concede in their response brief, however, that any constitutional claims against Defendant Lovingier, Foos, Wilson, and Whitman in their individual capacities based on Vigil's arrest and detention are time-barred.  Plaintiffs' Response, ECF No. 228,

129.  Accordingly, only Defendant McCabe remains as a defendant sued in his individual capacity for the civil rights claims asserted by Plaintiffs Ulibarri and the Estate.

In addition, Defendants argue that Plaintiff Ulibarri cannot assert claims for constitutional violations on her own behalf because the alleged constitutional injuries here were inflicted on Vigil, not Ulibarri.  Although there is a recognized constitutional cause of action for deprivation of a familial relationship, the government conduct at issue must be directed at the plaintiff and intended to deprive him or her of that relationship.  *Trujillo v. Bd. of Cty. Commr's*, 768 F. 2d 1186, 1190 (10th Cir. 1985).  Ulibarri does not assert any such claim and all other alleged constitutional violations involve conduct directed at Vigil.  It appears that Vigil is represented here by his Estate, not Plaintiff Ulibarri.  Accordingly, I agree with Defendants that summary judgment should enter in their favor on any civil rights claims asserted by Ms. Ulibarri.

The individual Defendants have asserted qualified immunity as a defense.  "In an action under section 1983, individual defendants are entitled to qualified immunity unless it is demonstrated that their alleged conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known."  *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999).  Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct.  *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004).  In *Pearson v. Callahan*, 129 S.Ct. 808 (2009), the Supreme Court held that the court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the

43

circumstances in the particular case at hand." 129 S. Ct. at 818.

A municipality or other governmental entity is not subject to liability simply because it was the employer or principal; instead, liability under section 1983 accrues only where the action alleged to be unconstitutional executes or implements a governmental policy or custom. *Monell v. New York Dep't of Social Services*, 436 U.S. 658, 690-91 (1978). Denver would not be liable under section 1983 solely because its employee inflicted injury. *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *Monell*). Rather, municipal liability would require (1) the existence of a policy or custom; and (2) a direct causal link between the policy or custom and the injury alleged. *Id.* (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989)). "When the claim is a failure to act, the plaintiff must demonstrate the [governmental entity's] inaction was the result of 'deliberate indifference' to the rights of its inhabitants." *Id.* (punctuation omitted). Under Tenth Circuit law, the deliberate indifference standard may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999); *see also Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988) (a supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable).

To establish individual supervisory liability, a plaintiff must establish a "deliberate, intentional act" by a supervisor such that there is a "sufficient causal connection" between the supervisor and the constitutional violation. *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). Mere negligence is not sufficient to establish liability. *Id.*

44

Rather, a plaintiff must show active participation or acquiescence through personal participation, exercise of control or direction, failure to supervise, or tacit authorization of the offending acts. *Id.* at 1152-53. If a sheriff is responsible for proper management of a jail, the sheriff maybe accountable if he "knew or should have known of the misconduct, and yet failed to prevent future harm." *Meade,* 841 F.2d at 1528 (citations omitted).

I now turn to the evidence presented in support of each claim to determine whether it adequately establishes that a constitutional violation occurred, that the individual defendant inflicted it, whether the constitutional right was clearly established, and whether the injury arose from a policy or custom of Denver.

### a.  Claim 3: Violation of Vigil's Eighth Amendment Rights

The third claim for relief asserts that Denver and its employees were deliberately indifferent to the serious medical needs of Vigil in violation of the Eighth Amendment, which applies to pretrial detainees through the Fourteenth Amendment. *Martin v. Bd. of County Comm'rs*, 909 F.2d 402, 406 (10th Cir.1990) ( "pretrial detainees are entitled under the fourteenth amendment's due process clause to the same degree of protection regarding medical attention afforded convicted inmates under the eighth amendment."). The theory underlying this claim appears to be that by isolating Vigil, failing to provide him with a sign language interpreter, keeping him in administrative segregation, failing to permit him the opportunity to meet with the ARB, and failing to timely conduct rounds, the Jail deputies were deliberately indifferent to Vigil's depression and suicidal impulses, resulting in his death. The supervisors are alleged to be liable individually and Denver is alleged to be liable as a municipality because of the failure to adequately train and supervise the deputies in this regard.

45

It is well established that prison officials violate the Eighth Amendment if their "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted). However, a claim based on "an inadvertent failure to provide adequate medical care" or alleging "that a physician has been negligent in diagnosing or treating a medical condition" does not state a valid claim of medical mistreatment under the Eighth Amendment. *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006) (citations omitted). "Rather, 'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle*, 429 U.S. at 106).

To demonstrate an Eighth Amendment violation, an inmate must satisfy both objective and subjective elements. The objective component is met if the deprivation is "sufficiently serious," i.e., one that "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir .1999)).

The subjective component of the deliberate indifference test is met if the defendant "knows of and disregards an excessive risk to inmate health or safety." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). "Deliberate indifference" does not require a showing of express intent to harm, rather, it is enough that the official acted or failed to act despite his or her knowledge of a substantial risk of serious harm. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005) (citations omitted).

I conclude that the evidence here is simply insufficient to establish deliberate

46

indifference. None of the evidence produced by Plaintiffs indicates that Vigil had been suicidal prior to his incarceration or at the time of his medical screening. The deputies who observed Vigil had no recollection of any behaviors that would have indicated that he was depressed or suicidal or even that he lacked the means of communicating such feelings. Plaintiffs make much of several factors present that could have increased Vigil's risk of suicide, including the possibility of a long sentence and Vigil having a birthday while incarcerated. They do not present any evidence, however, that the deputies were aware of these issues. Indeed, such information was not routinely provided to the deputies. I note that although Vigil's mother observed him in distress, she also did not have any reason to believe he would harm himself and did not warn the Jail or anyone else that he was at risk. Plaintiffs also argue that Vigil could not communicate even if he wanted to because of the failure to provide a sign language interpreter. Again, however, they have not shown that the deputies had reason to know that not informing Vigil of the availability of a sign language interpreter or TDD would lead to his death. Vigil had a sign language interpreter at several court appearances at which his mother and his attorney were present but did not communicate to them that he was contemplating suicide.

Plaintiffs cite *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (abrogated on other grounds by *Sandin v. O'Connor*, 515 U.S. 472 (1995)) for the proposition that "[p]rison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff." This may be true but is inapplicable to the facts of this case. The evidence establishes that Vigil could communicate through writing and otherwise sufficiently to at least alert medical staff that he needed assistance and that medical staff made regular and frequent visits to the Jail.

47

Indeed, Ms. Ulibarri testified in her deposition that her son could always communicate to her when he'd had a bad day or was upset about something.  Ulibarri Dep., Exh. A-14 to Denver's Mot. for Summ, J., ECF No. 197-17, 54.  Vigil had also made clear that he wished to see the ARB, and, at the PADF, had been able to communicate to another inmate sufficiently for the inmate to make a telephone call on his behalf and inform his family of his needs.  Had he made an effort to seek medical help and the Jail still did not provided a sign language interpreter to facilitate the treatment and diagnosis of his condition, then the issue might be closer.  Under the facts presented here, however, no reasonable jury could find that the persons supervising Vigil at the Jail were aware of a specific risk that he would commit suicide but nonetheless disregarded that risk by failing to take reasonable measures to prevent it.  *See Barrie v. Grand Cnty., Utah*, 119 F.3d 862 (10th Cir. 1997); *Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (no deliberate indifference in case of inmate suicide where detention center staff had no actual knowledge of suicide risk and the facts did not suggest that inmate's "risk of suicide was so substantial or pervasive that knowledge can be inferred.").

Because there was no underlying constitutional violation, the supervisor Defendants cannot be liable in either their official or individual capacities.  *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995).  Therefore, summary judgment should enter in favor of Defendants and against the Estate on this claim.

### b.     Claim 4: State Created Danger to Vigil and Burke

This claim alleges violations of the Fourteenth Amendment substantive due process guarantees against all the Defendants, individually and officially, under a theory of placing

Vigil and Burke in state-created danger.[18]   This is a theory whereby state actors may be liable for the acts of private third parties.  *Liebson v. New Mexico Corr. Dep't*, 73 F.3d 274, 276 (10th Cir. 1996) (discussing both the special relationship doctrine and the "danger creation" theory, which arises when the state creates the danger that harmed the individual) (citations omitted).  In the Tenth Circuit, a plaintiff states a claim under the state-created danger doctrine if the following elements are established: (1) plaintiff was a member of a limited and specifically definable group; (2) defendants' conduct put plaintiff at substantial risk of serious, immediate and proximate harm; (3)  defendants created the danger or increased plaintiff's vulnerability to the danger; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.  *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262-63 (10th Cir. 1998).  "The key to the state-created danger cases . . . lies in the state actors' culpable conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid."  *Id.* at 1263 (quoting *Johnson v. Dallas Ind. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)).  The Tenth Circuit has considered the danger creation theory in the context of a suicide.  *Christiansen v. City of Tulsa*, 332 F.3d 1270 (10th Cir. 2003); *Armijo*, 159 F.3d at 1256.

To establish the "shocks the conscience" element, a plaintiff must demonstrate "deliberately wrongful government decisions rather than merely negligent government

---

[18]In their Response Brief, Plaintiffs also appear to argue that Krebs was placed in enhanced danger.  However, the Second Amended and Supplemental Complaint does not contain a claim by Krebs under this theory and there are no facts to indicate that Krebs was placed in danger of any harm from a non-state actor.

conduct." *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992)). As noted in *Collins*, the Due Process Clause "is not a guarantee against incorrect or ill advised [government] decisions." 503 U.S. at 129. Therefore, a plaintiff asserting a substantive due process claim must establish either an intent to harm or an intent to place a person unreasonably at risk of harm, *i.e.*, when a state actor "was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." *Uhlrig*, 64 F.3d at 573-74 (citations omitted). Moreover, the plaintiff must "demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking," in other words, "a high level of outrageousness." *Id*. at 574.

Defendants argue that the Estate cannot prevail on this claim because it cannot show that the Defendants or any other responsible employee engaged in conduct in the treatment of Vigil that is conscience shocking. I agree. The failures described, such as housing Vigil in administrative segregation for his own safety, failing to provide an interpreter for the medical screening, and perhaps not conducting regular rounds, are at most negligent or ill-advised. Again, without any known history or indication of suicidal impulses, there is simply no evidence sufficient to show that any of the state actors were aware of a "known or obvious risk that was so great that it was highly probable that serious harm would follow" but that these officials nonetheless "proceeded in conscious and unreasonable disregard of the consequences." The facts alleged here simply do not demonstrate the "high level of outrageousness" needed to state a substantive due process

claim.[19]

With respect to Burke, her allegations regarding her late night release and the potential harm from being unable to communicate or get herself home could fall under the state-created danger theory.[20] Plaintiffs argue that Burke's situation is analogous to the "classic" state created danger scenario, where police officers impounded a woman's car and abandoned her in a high crime area at 2:30 a.m. *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). In their motions, Defendants argue again that the conscience shocking element cannot be established because there is no evidence to show that they intended to harm Burke or recognized that she was at an unreasonable risk of harm. I agree with Defendants.

There are numerous facts that distinguish Burke's situation from the facts of *Wood*. Burke was not abandoned in a high crime area; rather, she was released from a detention facility where there was a safe waiting area and where she was surrounded by law enforcement officers. It is clear that she suffered unnecessary difficulty because of the PADF's unwillingness to assist her in contacting her family and in their failure to give her the message that her husband was coming to pick her up. The officers offered her the use of a PDD; although it may not have been operational there is no evidence that the deputies or staff knew that it did not work or that Burke otherwise could not make use of it. Burke

[19]The facts of *Armijo,* which Plaintiffs rely on, are distinguishable. In that case, school officials suspended a minor who was known to have expressed suicidal thoughts and sent him home where officials knew he would be alone and had access to firearms. 159 F.3d at 1264.

[20]In their Response Brief, Plaintiffs also appear to argue that the failures to provide adequate medical attention amounts to a state created danger. However, they cite no case law recognizing application of this theory to such facts.

51

has not shown that the officers would have been aware of the risk that instead of waiting in the facility for public transportation to begin that Burke would leave and accept a ride from a stranger. This simply does not amount to a "known and obvious risk" that the PADF staff consciously and unreasonably disregarded. As discussed above, these facts adequately form the basis of a failure to accommodate claim under the ADA and Rehabilitation Act but do not demonstrate the level of outrageousness required to establish a substantive due process violation.

      c.    <u>Claim 6: Special Relationship Responsibility to Vigil, Burke and Krebs</u>

This claim is predicated on the second doctrine whereby a state actor may be held liable for the acts of a private third party. *Armijo*, 159 F.3d at 1261 ("[I]f the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others."). This claim is asserted by the Estate, Krebs, and Burke.

With respect to Krebs and Burke, I see no evidence of a violent act or other act inflicted by a third party while in the custody of the Defendants. To the extent Burke bases her claim on her inability to get home safely <u>after</u> her release, that claim is analyzed above under the state-created danger theory.

The Estate's claim appears to be premised on the theory that by taking Vigil into custody, Defendants undertook responsibility to prevent Vigil from harming himself. Plaintiffs' Response Brief, ECF No. 228, 157 (citing *Youngberg v. Romero*, 457 U.S. 307, 324 (1982)). Plaintiffs' cited cases, however, concern only the general principle that custodial facilities must not ignore an inmate's serious medical needs. The issue of Vigil's

serious medical needs has been addressed above, and the Tenth Circuit has indicated that the Eighth Amendment provides the appropriate framework in analyzing prison suicide cases. *Barrie*, 119 F.3d at 866 ("we note that claims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody."). Otherwise, Plaintiffs cite case law concerning the general responsibility to provide for "reasonable safety" to custodial inmates. Plaintiffs do not, however, cite any authority to show that "safety" includes preventing an inmate's harm to himself. Plaintiffs appear to argue that by failing to provide him adequate means of communicating, the Defendants "imposed on [Vigil's] freedom to act on his own behalf." Response Brief at 158.

As discussed above, however, I disagree that Vigil had no means of communication at all; rather, his means of communication were far from optimal but adequate to indicate if he was in need or distress. Moreover, while additional effort might have made a difference in preventing the harm, there is simply no evidence to establish conduct that shocks the conscience. Accordingly, this claim fails.

> ### d. Claim 5: Failure to Train and Supervise Resulting in Due Process Violations

Because I find no due process violations, I need not address whether the alleged failure of the individual Defendants or Denver to adequately train and supervise the deputies and staff of the detention facilities gives rise to municipal or supervisory liability.

> ### 3. Claims 7-9: State Negligence and Wrongful Death Claims

Plaintiff Ulibarri asserts a wrongful death claim against Denver on her own behalf. She and the Estate assert two negligence claims against Denver for negligence in failing

to prevent Vigil's suicide and for failure to train and supervise. Denver asserts a defense of governmental immunity to a portion of these claims and otherwise asserts that the Plaintiffs cannot establish the elements of the wrongful death and state claims.

a.    Governmental Immunity

The Colorado Governmental Immunity Act ("CGIA") provides governmental immunity for "all actions which lie in tort or could lie in tort" unless immunity is waived. C.R.S. § 12-10-105(a). Immunity is waived for injuries resulting from the operation of any jail by a public entity. C.R.S. § 12-10-106(1)(b). The "operation" of a facility is defined as "the act or omission of a public entity or public employee in the exercise and performance of the powers, duties, and functions vested in them by law with respect to the purposes of any public . . . jail . . . ." C.R.S. § 24-10-103(3)(a). In other words, sovereign immunity is waived only if the activity at issue relates to the facility's primary "purpose." *Pack v. Arkansas Valley Corr. Facility*, 894 P.2d 34, 37 (Colo. App. 1995). Therefore, governmental immunity was not waived for a visitor's claim against a correctional facility and its warden resulting from a slip and fall injury a visitor sustained in the parking lot; the "purpose" of the correctional facility, like hospitals and jails, was to house persons for continuous periods, not to maintain a parking facility. *Id.*; *see also Flores v. Colo. Dep't of Corr.*, 3 P.3d 464, 466 (Colo. App. 1999) (distinguishing *Pack* in the case of a slip and fall within the visitor area of a correctional facility and therefore finding a waiver of immunity; "because the purpose of a correctional facility is to manage convicts safely and effectively, and visitation within the facility directly assists in meeting that purpose, the maintenance of the visitor area within the custodial facility here is directly related to the purpose of the correctional facility").

54

Denver argues that it is not liable, therefore, for any injuries arising from the exercise of powers, duties, and functions <u>not</u> vested in the Sheriff Department by law, specifically any duty to train and supervise. I disagree. Under Colorado law, each county is required to have a jail "for the detention, safekeeping, and confinement of persons and prisoners lawfully committed." C.R.S. § 17-26-101. The Sheriff is responsible for "the manner in which the same is kept" and "shall see that the same is kept clean, safe, and wholesome." C.R.S. § 17-26-102. The acts and omissions alleged here all concern the vested duty and powers of the Sheriff Department in keeping inmates safe and healthy, including proper classification, supervision, and provision of medical care, which implies the duty to adequately train and supervise in these areas. *See also* C.R.S. § 17-26-104.5 (concerning medical care in county jails); *Flores*, 3 P.3d at 466. Accordingly, I am persuaded that the waiver of governmental immunity for the operation of a jail applies to all of Plaintiffs' claims here.

b.    <u>Merits of Wrongful Death and Negligence Claims</u>

Plaintiff Ulibarri and the Estate's claims[21] are basically premised on the notion that the Jail was negligent in failing to prevent Vigil's suicide and did not adequately train its staff in this regard. To establish a *prima facie* claim of negligence, a plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and causation (i.e., that the defendant's breach caused the plaintiff's injury). *Gerrity Oil & Gas*

---

[21]As noted above, Ulibarri's claim is for wrongful death, which is permitted under Colorado law, while the Estate's claims are in a representative capacity for Vigil. *See Rowell v. Clifford*, 976 P.2d 363, 364 (Colo. App. 1998) (provision creating cause of action for wrongful death is separate and distinct from the action that the injured person would have had for personal injuries if he or she had survived).

*Corp. v. Magness*, 946 P.2d 913, 929 (Colo.1997). Whether a party owes a legal duty to another is a question of law for me to decide. *Metro. Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 317 (Colo.1980).

In determining whether the law imposes a duty on a defendant to exercise reasonable care, I examine the following relevant factors: "(1) the risk involved, (2) the foreseeability of harm to others and likelihood of injury as weighed against the social utility of the actor's conduct, (3) the magnitude of the burden of guarding against the injury or harm, and (4) the consequences of placing the burden on the actor." *Montoya v. Connolly's Towing, Inc.*, 216 P.3d 98, 104 (Colo. App. 2008). No one factor is controlling and the issue essentially comes down to "fairness under contemporary standards." *Id.* In addition, in making this analysis Colorado law distinguishes between acting and failure to act; "by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made the situation no worse, and had merely failed to benefit him by interfering in his affairs." *Western Innovations, Inc. v. Sonitrol Corp.*, 187 P.3d 1155, 1159 (Colo. App. 2008) (citations omitted). While generally a tortfeasor's nonfeasance does not give rise to liability, a duty to take affirmative action may arise where there is a "special relationship" between the parties. *Id.*

Denver argues that the existence and scope of a duty of a jailer to prevent an inmate's suicide has not been determined by Colorado courts. It argues that to the extent such a duty exists, "the scope of the duty to prevent an inmate's suicide should, at a minimum, require that the officers were aware of a specific risk that the prisoner would commit suicide, as the Tenth Circuit requires in a civil rights claim." Denver's Mot. for Summ. J., ECF No. 197, 64. I disagree. As discussed in detail above, the standard for a

56

civil rights claim in a jail suicide is deliberate indifference, which is a heightened standard for a plaintiff to meet, and is affirmatively <u>not</u> a negligence standard. Accordingly, I disagree that the duty in a state negligence action should be deemed equivalent to that required in a constitutional claim.

Plaintiffs argue that Denver's duty to Vigil in the operation of the Jail included the duty to provide appropriate classification, communication and supervision. Plaintiffs contend that Denver breached those duties by isolating Vigil in the special management area solely on the basis of his disability, failing to allow Vigil to appear before the Administrative Review Board despite his request to do so, failing to provide Vigil or his family any effective way of communicating and failing to provide Vigil any effective way of communicating with the deputies and medical staff, failing to adequately supervise Vigil, and generally "[a]cting in a manner without due regard for the safety of Mr. Vigil." Plaintiffs' Response Brief, ECF No. 228, 183.

I now examine whether the law would impose a duty on a jailer to take reasonable care to prevent an inmate from committing suicide by providing proper classification, supervision, and communication, and to adequately train staff in these areas. I note first that the risk involved is quite serious. As Denver and Plaintiffs' evidence demonstrates, suicide is a significant risk among incarcerated populations and is a major cause of death in jails and detention facilities. Romero Aff. Attach. 6, ECF No. 197-8 ("Suicide is the number one cause of death in jails"). Second, the harm is foreseeable; inmate suicides are a documented hazard and, again, the evidence presented shows that numerous factors present in a detention facility, including isolation, demoralization, and an authoritarian environment, could contribute to despair. Foos Dep., Exh. 6 to Plaintiffs' Response, ECF

No. 229-7, 87-89.  The evidence indicates the burden is not significant and that these processes are already in place to a large extent.  Moreover, there is overwhelming social utility in placing this burden on the jail and its personnel, as inmates have no other source of protection or assistance and must rely almost solely on the facility for protection, communication, and medical and psychiatric services.

I conclude that Colorado courts would recognize that the Jail owes the duties described by Plaintiffs to its inmates in the operation of the facility.  The "due care" required in the execution of that duty would be performance in a manner "in accordance with the knowledge and skill ordinarily possessed by [other] practitioners under similar circumstances."  *Perreira v. State*, 768 P.2d 1198, 1220 (Colo. 1989).

There are significant issues of fact regarding whether these duties were breached and whether these failures proximately caused Vigil's death.  Accordingly, summary judgment on the negligence claims is not appropriate.

Accordingly, it is ordered:

1.     The Objections (ECF Nos. 80 and 113) to orders entered by Magistrate Judge Michael J. Watanabe are overruled and the orders are affirmed.

2.     The Motion to Strike (ECF No. 224) filed by Plaintiffs and the Motion to Strike Exhibits (ECF No. 243) filed by Defendants are granted in part and denied in part as described in Part B of this order.

3.     The Motions for Summary Judgment (ECF Nos. 197 & 198) filed Defendants are granted in part and denied in part as follows:

a) The motions are denied as to Claims 1 and 2.

b) The motions are granted as to Claims 3, 4, 5, and 6, the

constitutional claims for relief.  Summary judgment shall enter in favor

of all Defendants on these claims.

c) The motions are denied as to Claims 7, 8, and 9.

d)  The individual defendants may have their costs.

DATED at Denver, Colorado, on September 30, 2010.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge