IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 07-cv-01814-WDM-MJW

DEBBIE ULIBARRI;
ESTATE OF SHAWN FRANCISCO VIGIL;
COLORADO CROSS-DISABILITY COALITION, a Colorado corporation;
COLORADO ASSOCIATION OF THE DEAF, a Colorado corporation;
ROGER KREBS; and
SARAH BURKE,

       Plaintiffs,

v.

CITY & COUNTY OF DENVER,

       Defendant.

---

## ORDER ON MOTION TO EXCLUDE EXPERT WITNESS OPINIONS

---

Miller, J.

       This case is before me on the Fed.R.Evid. 702 Motion to Strike Expert Witnesses (ECF No. 246) filed by Defendant City and County of Denver ("Denver"). Plaintiffs oppose the motion. A hearing was held on the motion on April 19, 20, and 21, 2011, where testimony and exhibits were received into evidence. Pursuant to my order, the parties submitted supplemental briefing on specific issues and post-hearing briefs. I have reviewed the arguments, evidence, and authorities provided at the hearing and in the written briefs. For the reasons set forth below, the motion will be granted in part and denied in part.

<u>Background</u>

       This is a disability rights case concerning the arrest and detention of several deaf

individuals by the members of Denver's Police and Sheriff Departments and the practices of those entities with respect to persons with disabilities.   The persons arrested and detained are Shawn Vigil, who committed suicide while at the Denver County Jail ("Jail") and is represented here by his Estate, Plaintiff Roger Krebs, and Plaintiff Sarah Burke. Plaintiff Debbie Ulibarri is the mother of Mr. Vigil.   Plaintiffs Colorado Cross-Disability Coalition and Colorado Association of the Deaf assert claims seeking injunctive and other equitable relief.   The only remaining Defendant at this time is the Denver.   Following my ruling (ECF No. 265) on various motions, including motions for summary judgment, the following claims remain pending:

* ADA/Rehabilitation Act claim by the Estate related to Vigil's detention and death (Claims One and Two);[1]

* ADA/Rehabilitation Act claim by Krebs related to his detention (specifically to the manner of conducting his arraignment) (Claims One and Two);

* ADA/Rehabilitation Act claims by Burke related to her arrest and release from detention (Claims One and Two);

* ADA Rehabilitation Act claims for injunctive relief by the organizational plaintiffs, CCDC and CAD (Claims One and Two);

* the Estate's and Ulibarri's negligence and negligent failure to train/supervise claims related to Vigil's detention and suicide (Claims Seven and Nine); and

* Ulibarri's claim for wrongful death (Claim Eight).

Second Amended Complaint (ECF No. 48).

---

[1]      Claims related to Vigil's arrest and intake at the Pre-arraignment Detention Facility ("PADF") were dismissed as barred by the statute of limitations.

Denver has moved to exclude the proposed testimony of three experts designated by the Plaintiffs:

* Mark Pogrebin, Ph.D., designated as an expert on jail policies and procedures.

* Jean Andrews, Ph.D., designated as an expert on the deaf and their communication.

* Linda Edwards, RN, MHS, CDE, designated as an expert to testify regarding diabetes and standards of medical care as related to the treatment of plaintiff Burke.

At the hearing, Denver withdrew its objection to Ms. Edwards with respect to at least some of the issues raised in its motion, but in its post-hearing brief maintains that Ms. Edwards opinions should be excluded on relevance grounds. *See* Denver's Post-Hearing Brief Regarding Rule 702 Mot., ECF No. 314, at n. 1.   Relevance issues are better addressed in their full context at trial and I decline to rule on an *in limine* basis.

At the three-day hearing, Dr. Andrews and Dr. Pogrebin testified and were cross-examined by Denver's counsel.  Denver also offered a rebuttal witness, Gary L. Wilson, the Director of Corrections and Undersheriff at the Denver Sheriff Department.   Following receipt of testimony and other evidence at the hearing regarding the qualifications of Dr. Pogrebin and Dr. Andrews and their proposed opinions, I ruled in part on the issues.  To restate my oral ruling with respect to Dr. Andrews, I determined that she possessed specialized knowledge concerning communications between the deaf and the hearing to be qualified as an expert in order to opine on the topic.  Tr., April 21, 2011, at 115-116. This expertise included the psychological impact on the deaf.  However, I would sustain objections to any specific opinion as to the cause of Mr. Vigil's suicide. *Id.* at 116.  As to

Dr. Pogrebin, I held that he was qualified to render an opinion regarding "the administration and operation and management of the jail." *Id.* at 126. I also held that he could testify about the mental health impact of jail on a person in custody, but not precisely as to Vigil. *Id.* at 127.

Standard of Review

Fed.R.Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This Rule assigns to the court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Under *Daubert*, a trial court faced with a proffer of expert testimony

> must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592-93.

This "gatekeeping" function applies to all expert testimony proffered under Rule 702. *Kumho Tire Co., Ltd. v. Carmichael*, 516 U.S. 137, 149 (1999) (extending *Daubert*'s holding on scientific expert testimony to all expert testimony). The objective of the function "is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert,

4

whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Although I am required to engage in this gatekeeping function, how I perform the function is within my discretion. *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1119 (10th Cir. 2004) (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)). To fulfill my obligations, I must "make specific factual findings on the record which are sufficient for an appellate court to review [my] conclusion concerning whether the testimony was scientifically reliable and factually relevant." *Id.*

*Daubert*'s gatekeeping function has been distilled into two inquiries: (1) whether the expert's proffered testimony has "a reliable basis in the knowledge and experience" of the expert's discipline and (2) whether the proposed testimony or evidence "is sufficiently 'relevant to the task at hand.'" *Id.* at 1120, 1121 (quoting *Daubert*, 409 U.S. at 592, 597).

With regard to the first question, *Daubert* sets forth four factors to provide guidance in determining the reliability of the expert opinion:

> (1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has "general acceptance."

*Id.* at 1120 (quoting *Daubert*, 509 U.S. at 593-94). These factors are not exclusive and should be applied as relevant to the particular case at hand. *Kumho*, 526 U.S. at 152-53. *See also Daubert*, 509 U.S. at 591 (the theory must "fit" the facts of the case, *i.e.*, be relevant). I have "considerable leeway" in determining how to test an expert's reliability. *Kumho*, 526 U.S. at 152.

<u>Discussion</u>

1.    <u>Mark Pogrebin, Ph.D.</u>

Dr. Pogrebin has been qualified as an expert in the field of corrections and jail administration.  His opinions are based in large part on the national standards published by the American Correctional Association ("ACA") and other published information, as well as his own knowledge and expertise.  According to his verified statement (ECF No. 292-2), he proposes to opine that Denver breached its duty of care to Vigil with respect to booking, intake and classification process at the PADF and this breach was the cause of Vigil's suicide.  This opinion is based primarily on various alleged failures to properly screen and identify Vigil's mental status and communication needs.  Dr. Pogrebin further opines that Denver also breached its duty of care when Vigil was transferred to the Jail, which also caused Vigil's suicide, by: (1) placing Vigil in administrative segregation; (2) failing to offer necessary accommodations needed to identify and prevent suicide risks; (3) failing to present him to the Administrative Review Board with a sign language interpreter; (4) failing to provide notice to inmates with disabilities of their rights and of accommodations available; (5) placing Vigil in a remote cell and failing to properly monitor him; (6) failing to provide appropriate policies regarding deaf inmates.  Dr. Pogrebin also opines that Denver breached its duty of care by failing to adequately train officers on issues relating to deaf inmates and suicide prevention, both at the academy and ongoing.

Following my rulings at the hearing as well as my resolution of a number of issues in the motions for summary judgment, several of the objections raised by Denver in its Rule

702 motion are now moot or resolved.[2]   The primary remaining issues concern whether Dr. Pogrebin may testify concerning events occurring outside of the statute of limitations for Plaintiffs' claims, specifically alleged errors in the intake, medical screening, and classification process at the PADF.  The second issue is whether Dr. Pogrebin may opine that the ACA standards represent the appropriate standard of care regarding Denver's alleged negligent acts and omissions and that Denver failed to comply with those standards.

  a. <u>Events Occurring Outside Statute of Limitations</u>

  I requested supplemental briefing from the parties regarding the admissibility of facts and opinions relating to the events occurring in connection with Vigil's intake and classification; these facts may not support a claim because they are time-barred but may be admissible for other purposes.  Plaintiffs argue in their memorandum of law on the issue (ECF No. 315) that the challenged evidence is relevant as background for the experiences of the individual plaintiffs and is relevant to the organizational plaintiffs' claims for injunctive relief.  Plaintiffs argue that under Rule 401 of the Federal Rules of Evidence, evidence is relevant where it has "any tendency to make the existence of any fact that is of

---

  [2]In the Rule 702 Motion, Denver challenges Dr. Pogrebin's proposed testimony on the following grounds: (1) he is not sufficiently qualified to render opinions on policies and procedures for intake, classification and mental health screening for deaf prisoners or on the treatment and supervision of inmates with disabilities (deafness) and mental health problems; (2) his opinions concerning non-compliance with American Corrections Association recommendations are not reliable; (3) he should not be allowed to offer subjective, personal opinions concerning whether Vigil was depressed or concerning Vigil's ability to communicate when in the Jail; (4) his opinions concerning Vigil's mental health are unreliable because they ignore significant facts in evidence; and (5) he should be prohibited from rendering an opinion on an ultimate issue.  Denver also challenges Dr. Pogrebin's opinions regarding events occurring outside the statute of limitations.

consequence to the determination of the action more probable or less probable than it would be without the evidence."  Moreover, relevance is shown where a fact may assist in making an inference or a chain of inferences.  *United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998).  Plaintiffs cite numerous cases in which evidence of events occurring outside the statute of limitations was admitted as background.  *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (employment discrimination case).

Here, Plaintiffs argue the background evidence is relevant to several issues, including whether Denver followed a custom or pattern or practice of failing to provide reasonable accommodations to deaf inmates.  They further argue that the jury needs to understand that Vigil's detention involved a continuing course of events that gave rise to his harm.  In particular, Plaintiffs urge that the jury should understand that Vigil was not evaluated for his risk of suicide or medical/psychological history at the inception of his incarceration and that this affected every subsequent aspect of his detention.  Similarly, they contend that because Vigil was not given a sign language interpreter at his admission, he was not given the opportunity to understand his surroundings and that this would have contributed to his feelings of isolation and confusion.  Plaintiffs also argue that  this evidence is not unfairly prejudicial in that it is not emotionally provocative or inflammatory and that any tendency to confuse the jury on liability issues can be remedied with a jury instruction.

In response, Denver contends that the facts may be admissible but that expert opinions regarding the time-barred events should be excluded.  In that regard, Denver submits as examples that documents concerning Vigil's initial medical screening and other questionnaires would be admissible as background, as would be evidence of the routine

practices of the Jail for these activities.  Expert opinions regarding these events, however, should not be admitted, according to Denver, because of relevance and jury confusion concerns.  Denver argues that a limiting instruction concerning the expert opinions would not suffice to cure the prejudice.  Denver further contends that this is not  a "pattern or practice" case and that such evidence is not probative of any element of the disability discrimination claims or of the claims for compensatory damages.  With respect to the request for injunctive relief, Denver notes that this is an issue for the court, not the jury, and any claims for injunctive relief concerning Vigil's screening and intake are also time-barred.

I conclude that some of the evidence relating to Vigil's initial intake, medical screening, and classification is relevant and admissible.  I agree with Plaintiffs that this evidence provides context for the subsequent events, including how it came to be that Vigil was placed in segregation and the general lack of information about his mental health status and the extent of his disability and inability to communicate. I conclude this evidence is relevant to the question of whether the failure to accommodate is a pervasive problem such that deliberate indifference for the purposes of damages and the need for injunctive relief could be shown.  Accordingly, I will not categorically exclude all evidence pertaining to the events occurring outside the statute of limitations; trial objections, however, may be raised.  The parties may submit an appropriate limiting instruction for the jury regarding how such evidence should be treated.

However, given my ruling that the claims based on the arrest and intake of Vigil are barred by the statute of limitations, I agree with Denver that expert opinions whether the arrest and intake amounted to a breach of the duty of care has a danger of confusing the jury about whether these events can form the basis of liability.  I will, therefore, sustain

9

objections to expert opinions in this regard.   Nonetheless, I will not exclude all expert opinions as to these earlier events.   In order to assist the jury to understand the operation of the detention facilities and the steps that are taken to ensure proper placement and treatment, I will permit some expert testimony about the purpose and intent of the intake, classification, and screening process and of the documents used.   That testimony may include how effective communication between the deaf and those conducting the intake can be achieved.   I do conclude that this evidence is relevant to the jury's understanding of the cumulative effect of Vigil's incarceration on his mental state and the alleged failures to accommodate his disability later at the Jail.   Again, the parties may suggest appropriate jury instructions regarding these opinions.

       b.   <u>ACA Standards</u>

      The parties disagree on whether the ACA recommendations may properly be used to evaluate Plaintiffs' claims.   Dr. Pogrebin cites ACA recommendations to support his opinions that Denver breached its duty of care to Vigil and asserts that ACA standards "represent the acceptable community standards of practice and jail management." Pogrebin Statement at 10 (ECF No. 292-2).   He also references testimony by Chief Foos that the ACA provides standards of acceptability in the jail community.   *Id.*   At the hearing, I concluded that the ACA standards could be used as a frame of reference in determining the applicable standard of care for operating a jail but that these standards did not define the standard of care *per se.*   Tr., April 21, 2011, at 127.   In its post-hearing brief (ECF No. 314), Denver seems to argue that Dr. Pogrebin should not be able to rely on the ACA standards at all, arguing that his opinions misapply the ACA standards and that his methodology is therefore not sufficiently reliable.

Evidence presented at the hearing and with the briefs establishes that the ACA is a private, non-profit association comprised of a variety of professionals and experts in corrections administration.  The ACA standards are used as part of the ACA's accreditation program, which is purely voluntary.  It is undisputed that there is no requirement that any jail or other correctional facility be accredited by the ACA.[3]  The ACA standards include both mandatory and non-mandatory standards; to receive ACA accreditation, a facility must satisfy all of the mandatory standards and a specific percentage of the non-mandatory standards.  The standards have been revised over the years; currently the fourth edition is in effect and updates are issued on a regular basis.

Denver's criticisms of Dr. Pogrebin concern various technical errors in his expert report regarding which ACA standard he has applied and whether the standard is from the current fourth edition.  Denver also argues that Dr. Pogrebin does not distinguish between mandatory and non-mandatory standards.  In response, Plaintiffs note that the use of the standards for the purpose of accreditation is unrelated to the use of the standards as a guideline to determine the standard of care in the operation of a facility and that, therefore, these alleged discrepancies do not prove that Dr. Pogrebin's methods are unreliable.  I agree with Plaintiffs.  The evidence from Dr. Pogrebin and from Denver's own expert, Director Wilson, shows that the ACA standards represent the correctional community's understanding of the "best practices" for the operation of a jail or prison.  The ACA standards are therefore relevant and informative regarding the standard of due care applicable here, as I have already ruled.

---

[3]The Denver PADF and Jail were not ACA accredited at the time of Vigil's incarceration but have been at other time periods.

Dr. Pogrebin is not being offered as an expert in ACA accreditation but as a general expert in jail administration.  Therefore, Dr. Pogrebin's technical errors, which could be significant to the question of accreditation, do not render his opinions inadmissible.  The differences between the third and fourth edition of the relevant ACA standards are negligible; both substantively support Dr. Pogrebin's opinion regarding the alleged negligent acts and omissions of Denver in the operation of the Jail.  Similarly, the difference between mandatory and non-mandatory standards may be important to the accreditation process but is not relevant for the limited purposes for which I have ruled that the standards may be used.  On cross-examination, Director Wilson generally agreed with Dr. Pogrebin about the substance of Dr. Pogrebin's opinions regarding the importance of adherence to federal law, of proper mental health and medical screenings, of informed classification decisions, the need for comprehensive policies and training to prevent inmate suicides, and other key issues.  Therefore, I will not exclude Dr. Pogrebin's testimony or limit the use of the ACA standards any more than I have already ordered.

2.    Jean Andrews, Ph.D.

Dr. Andrews is the Director of Doctoral Graduate Programs in Deaf Education and a professor of deaf studies and deaf education at Lamar University in Beaumont, Texas.  She has worked with deaf individuals since 1975 and has engaged in extensive teaching and scholarship in the area.  She is a licensed teacher of the deaf and a licensed reading specialist.  She explains that she developed a communication/language profile of Vigil to determine which mode of communication and language he used; to do this she relied primarily on his school records and samples of his writing after his arrest, as well as deposition testimony.  She also conducted a readability analysis to determine the

12

readability grade level of Denver's publications given to Vigil at the PADF and Jail.

In her verified statement, she opines that Vigil's primary mode of communication was ASL and that he had a very low non-verbal IQ and low reading skills.  ECF No. 292-1 at 3. Her view is that English speech, lipreading, and note-writing would not have provided effective communication for Vigil as he had only a second grade reading level.  She opines that because of his low reading ability, he would not have been able to understand the intake questionnaire, Jail handbook, *Miranda* warning, and other documents that were the primary source of information for inmates.  She evaluates these as being written at a sixth grade reading level, except for the inmate handbook, which was written at a college reading level.   Therefore, she asserts that Vigil had no way of understanding the rules and regulations of the Jail or his rights and privileges.  She asserts that only ASL would have provided effective communication and that the failure to provide him one during the intake means that he could not communicate his medical and psychological needs.  He also could not understand what was going on or how to request assistance and that his inability to understand and lack of coping skills caused him to suffer "acute distress, anxiety and emotional and psychological pain."  *Id.* at 4.  She also argues that he was not provided with appropriate supervision and did not have any real interaction with deputies and nurses because of his inability to communicate.

Again, a number of the objections raised by Denver to Dr. Andrews' proposed opinion testimony have been resolved or are moot.[4]  As set forth in Denver's post-hearing

---

[4]In the Rule 702 Motion, Denver argues that Dr. Andrews is not qualified to render opinions on medical, mental health, and jail policy and procedures.  Denver also contends that several of Dr. Andrews' opinions regarding Vigil's isolation and mental state are not adequately supported by facts on the record.  In its hearing brief, Denver

brief (ECF No. 314), the only remaining issues are Denver's contention that Dr. Andrews' methodology for creating a communication/language profile for Vigil is unreliable and the admissibility of testimony regarding events occurring before the statute of limitations.[5]   I have already addressed the second issue and my discussion above is equally applicable to the opinions of Dr. Andrews.  Therefore, I examine only the reliability of Dr. Andrews' methodology in determining Vigil's ability to read, write, and otherwise communicate.

As noted by Plaintiffs, Denver did not raise this objection in its motion or supplemental briefing but rather asserted it for the first time at the hearing.  I need not address whether this argument should be barred because of this failure to timely raise it and the resulting prejudice to Plaintiffs, who were not prepared to address it at the hearing, because I conclude that Dr. Andrews' methodology is reliable.

Denver argues that Plaintiffs failed to present evidence to show that the "methodology for creating a communication/language profile for a deceased person" is reliable under *Daubert* because it is not tested, subject to peer review or known error rates or standards and controls, and is not generally accepted in the scientific community.  I

---

argues again that any opinions relating to events occurring before the statute of limitations should not be admitted.  Denver further objects to any opinion by Dr. Andrews to the effect that the "severe communication deprivation . . . was a cause of Mr. Vigil's taking his own life" because this opinion was not previously disclosed.  Finally, at the hearing, Denver raised an additional objection, specifically that Dr. Andrews' methodology in determining Vigil's reading ability and primary mode of communication is not reliable.

[5]Denver also argues that Dr. Andrews should not be permitted to opine on Vigil's actual mental state while incarcerated.  As noted above, I have already ruled that such opinions are inappropriate, although Dr. Andrews may testify generally about the common psychological effects of incarceration and communication difficulties on deaf persons.

14

disagree that *Daubert* is so rigid or narrow.  Dr. Andrews testified that the method she used to determine Vigil's language/communication ability relied on the types of data typically used in her field, including accepted tests normed for the deaf population, that she teaches this same method to her students and has included it in a published book, that this is the method used in her field for evaluating any person (living or deceased, available or unavailable), and that it is not uncommon for such evaluations to be done without a personal interview of the subject.  I am satisfied from this evidence that Dr. Andrews has applied  "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.   The fact that Dr. Andrews did not personally meet or interact with Vigil goes to the weight of the evidence and can be addressed on cross-examination but does not render her opinions in this regard inadmissible.

Denver also contends that Dr. Andrews' method is unreliable because she did not review all of Vigil's school records.  However, Dr. Andrews testified that she had reviewed all of the most recent records available and that the historical data was much less important than the records showing his ability nearest the time of his incarceration.  This again does not demonstrate that her methodology was unreliable.

Accordingly, it is ordered:

1.   Defendant's Fed.R.Evid. 702 Motion to Strike Expert Witnesses (ECF No. 246) is granted in part and denied in part.  The motion is granted with respect to Dr. Mark Pogrebin and Dr. Jean Andrews as follows: these experts may not opine as to the specific mental state of Vigil during his incarceration, may not opine as to whether acts and omissions occurring before the statute of

15

limitations amounted to a breach of the duty of due care, and may not opine that the ACA standards represent the standard of due care, although reference to the ACA standards will be permitted as informing the standard of due care.  The motion is otherwise denied as to these two witnesses and to the proffered expert testimony of Linda Edwards, without prejudice to trial objections.

DATED at Denver, Colorado, on June 28, 2011.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge