IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

DEBBIE ULIBARRI, et al.,           )
                                   )
            Plaintiffs,            )
                                   )
vs.                                )       Case No. 07-CV-1814-ODS
                                   )
CITY & COUNTY OF DENVER, et al.,   )
                                   )
            Defendants.            )

ORDER GRANTING IN PART AND DENYING IN PART
PARTIES' MOTIONS IN LIMINE

Pending are Motions in Limine filed by both sides in this dispute. The motions are granted in part and denied in part.

The parties are reminded that these rulings are interlocutory. Therefore, even if a request to exclude evidence is denied, an objection is necessary to preserve the issue. If evidence is excluded, it shall not be discussed in the jury's presence unless the Court is persuaded during trial to change its ruling.

The Court also intends these rulings to apply to proceedings in front of the jury. The rulings do not necessarily apply to proceedings in any subsequent proceedings relating to Plaintiffs' request for injunctive relief.

*Plaintiffs' First Motion (Doc. # 354)*

1.      Plaintiffs seek to preclude evidence of the crimes charged against Shawn Vigil. The Court believes the nature of the crimes (and their underlying facts) is of minimal relevance at best, and the minimal relevance is outweighed by the potential prejudicial effect on the jury. The Court believes there is a substantial risk of the jury being confused or inappropriately persuaded to find for Defendants if the jury learns Vigil was charged with kidnaping, sexual assault, and criminal attempt.

The Court agrees with Plaintiffs' proposal that the jury be told only certain things about the charges. It is sufficient and appropriate for the jury to know that Vigil was

charged with three serious felonies.[1]  It is also appropriate for the jury to know what Vigil may have been told at arraignment regarding the potential sentence he faced and, if he was told nothing, that he faced a significant sentence.  These facts are all the jury needs to know.

2.      Plaintiffs also seek to exclude evidence of Vigil's prior misdemeanor convictions.  The Court views these past convictions as less relevant than the felony charges Vigil faced at the time of his death.  Vigil's past convictions should not be mentioned in the jury's presence.

3.      Plaintiffs seek to preclude introduction of Debbie Ulibarri's prior convictions.  This request is granted in part and denied in part.

Ulibarri was convicted of theft in 1989, 1990, and 1991.  These convictions are more than ten years old and should not be admitted.  Fed. R. Evid. 609(b).  In reaching this conclusion, the Court is unpersuaded by Defendants' arguments that the evidence is relevant to Ulibarri's relationship with Vigil and does not believe the probative value of the convictions outweighs their prejudicial impact.

Ulibarri was convicted of driving under the influence and possessing a controlled substance in April 2001.  The former offense was a misdemeanor and the latter offense was a felony.  Misdemeanor convictions are generally not admissible, and this offense did not involve acts of dishonesty or false statements.  See Fed. R. Evid. 609(a)(2).  The possession charge, however, is admissible.  While Ulibarri was not sentenced to incarceration, it was punishable by more than a year of imprisonment – making it a felony.  She was sentenced to three years "to be served [in] the community corrections program," meaning she was released from the criminal system's custody in approximately April 2004.  This conviction is not more than ten years old, Fed. R. Evid. 609(b), and it may be admitted into evidence – but only to impeach Ulibarri's credibility.

---

[1] Plaintiffs propose that the jury be told there were two crimes charged, but it is the Court's understanding that there were three.  Obviously, the Court intends that the correct number be used.

In reaching this conclusion, the Court rejects Plaintiffs' intimation that admitting evidence of the conviction for this purpose will be more prejudicial than probative.

4.     In 2004, Sarah Burke pled guilty to a misdemeanor child abuse charge; she received a deferred judgment and sentence and was required to attend parenting classes. A warrant was issued in August 2007 because Burke failed to attend parenting classes. During a "welfare check," police officers conducted a routine check for outstanding warrants and learned of the warrant for Burke's arrest. The circumstances and events surrounding and following this arrest give rise to her claims in this suit. Plaintiffs seek to exclude evidence about the 2004 conviction and limit the jury's knowledge about the reasons for the warrant's issuance. As with Vigil's similar argument, the Court agrees with Plaintiffs. The jury does not need to know about the 2004 conviction or the reason the warrant was issued, and this information carries a risk of unfair prejudice. It is enough for the jury to know that a warrant was issued, and the warrant can be described as having been issued for "failure to appear" or some other mutually agreeable description. The jury can also be told that the warrant's validity is not being questioned.

5.     Roger Krebs was arrested following a scuffle with police and charged with municipal violations for disorderly conduct, assault and trespass. His sole remaining claim involves Defendants' failure to provide an interpreter during Krebs' arraignment, which allegedly prevented Krebs from participating as fully as a hearing-capable person would have. Plaintiffs seek to preclude evidence of the offenses with which Krebs was charged, but the nature of those offenses and Krebs' remaining claim requires a different ruling than the one made for Vigil and Burke.

Initially, the Court notes the charges against Krebs are far less severe than the information regarding Vigil and Burke that Plaintiffs sought to exclude. The Court discerns a significantly lower risk of unfair prejudice. In addition, Defendants should have an opportunity to persuade the jury that Krebs' participation in the arraignment was unencumbered by the absence of an interpreter. This means Defendants must be

permitted to introduce evidence about events during the arraignment, including communications between Krebs, the judicial officer, and others involved in the arraignment. There is no practical way to extract the content of these communications – which, necessarily, may address the charges against Krebs – while preserving a full and fair depiction of those events. Given the critical role of the events during arraignment and the diminished risk of unfair prejudice, Plaintiffs' request to exclude evidence about the charges against Burke is denied.

6.   Plaintiffs' request that all witnesses be required to appear in civilian clothing is denied.

*Plaintiffs' Second Motion (Doc. # 361)*

Plaintiffs' second motion in limine is filed under seal and addresses certain juvenile records or, at a minimum, records and other evidence about events that occurred when the individual in question was a juvenile. The motion is granted, and the evidence will not be permitted at trial.

*Defendants' Motion (Doc. # 358)*[2]

1.   Defendants invoke Rule 407 to preclude evidence of subsequent remedial measures. The Court intends to adhere to all the Rules of Evidence, including Rule 407 – but Defendants have not clearly identified the evidence they seek to exclude. For the most part, Defendants will have to rely upon contemporaneous objections to preclude evidence.

One item that has been identified is a May 5, 2009, memo sent by "Sergeant J. Romero" to "All Classification Staff" directing that certain people be contacted "[w]hen

---

[2]The Court summarily rejects the arguments set forth in Parts A and B of Plaintiffs' opposition.

interviewing a deaf inmate with the health questionnaire or the PSA." Plaintiffs (1) deny that this is evidence of remedial measures and (2) insist that it is admissible to show the feasability of remedial measures. Setting aside the seeming inconsistency of these arguments, the memo is barely relevant at all: surely, the actual memo is not necessary to demonstrate that it was feasible for a memo to be sent? In any event, Rule 407 specifies that evidence of the feasibility of remedial measures is only relevant if the feasibility of remedial measures is controverted by Defendants – so unless and until that is done, evidence regarding remedial measures may not be admitted. The May 5, 2009, memo is relevant for no other purpose, so it may not be admitted.

2.   Defendants seek to preclude admission of evidence regarding employee discipline, but do not specify the employees or the discipline at issue – making it virtually impossible for the Court to issue a ruling. However, in responding, Plaintiffs have shed light on some of the potential issues, and the Court will address those matters.

In December 2011 or January 2012, Division Chief Phillip Deeds was allegedly placed on leave pending an investigation. It does not appear the investigation is related to any of the incidents involved in this lawsuit. Plaintiffs represent that they have no other information about these matters. In an abundance of caution, the Court precludes admission of any such evidence until the matter has been discussed more thoroughly outside the jury's presence.

Nurse Robert Costin was the intake nurse who interviewed Vigil upon his admission to the Jail. He was allegedly disciplined and terminated by his former employer for failing to conduct adequate medical assessments. In 2008, he received a Letter of Admonition from the Board of Nursing for similar transgressions involving Emily Rice, an individual brought to the Jail several months after Vigil's suicide. In 2011, the Board of Nursing revoked Costin's nursing license for patient neglect, failure to provide proper care, and failure to maintain adequate records. The Court's difficulty is that none of these events involved Vigil, so the probative value of the evidence is unclear. Evidence of wrongdoing on one occasion cannot be used to argue wrongdoing occurred

on another occasion, Fed. R. Evid. 404(b), but this seems to be Plaintiffs' primary justification for the information.  The Board of Nursing's actions cannot establish Defendants' knowledge because those actions occurred *after* Vigil's suicide.  Evidence about Vigil's prior employment history may be relevant depending on the nature of Plaintiffs' negligence claims, but the Court lacks sufficient information to make even this assessment.  In an abundance of caution, all evidence about Costin's discipline and termination are excluded.

3.      As stated, Emily Rice was brought to the Jail several months after Vigil's suicide.  Sadly, she also committed suicide.  Plaintiffs do not plan to introduce evidence about litigation (or settlement of litigation) involving Rice.  The Court also holds that evidence regarding her suicide – and the manner in which she was treated and evaluated – is inadmissible.  The Court does not want to divert the jury's time and attention from evaluating the circumstances involving Vigil by, essentially, trying a completely different lawsuit.  The probative value of such an effort is minimal, as the facts about Rice would do little to establish the circumstances involving Vigil.  In addition to unnecessarily consuming time and risking confusion, there is a substantial risk the jury may be unfairly prejudiced in that they may believe Vigil was mistreated simply because Rice was.  For these reasons, evidence about Rice shall not be admitted.

4.      Defendants seek to preclude statistical evidence establishing that the Jail was over capacity and had experienced an increase in assaults by inmates and an increase in the use of force by staff.  Defendants contend the evidence is irrelevant.  Plaintiffs contend conditions described by this evidence can lead to "officer fatigue," causing deputies to be less attentive to the needs of inmates.  However, there is no suggestion of any evidence that deputies were actually fatigued, nor (more importantly) is there any suggestion of evidence that the deputies who monitored or interacted with Vigil were fatigued.  The statistics are not relevant and risk an invitation to the jury to speculate that the officers responsible for Vigil were fatigued without any specific information to support the point.

5.      In December, 2008, it was discovered the TDD machines at both the Jail and the PADF did not work.  This is not relevant to the issue of whether the machines worked in 2005 or 2007.  It may be relevant to the issue of injunctive relief, but it is not relevant to any issues the jury will decide and for that reason will not be admitted at trial.

6.      Defendants seek to exclude questions posed by the City's Independent Monitor, Richard Rosenthal.  Having reviewed Plaintiffs' explanation of the intended purpose for the evidence involving Rosenthal, the Court agrees with Plaintiff that the information may be admitted.

The City conducted an investigation following Vigil's death; the investigation was reviewed by Division Chief Ronald Foos to determine whether violations of policy had occurred.  The investigation's report was also reviewed by Rosenthal who, in writing, stated "I am concerned, however, that the investigation did not cover one key area of inquiry: was anyone in the Sheriff's Department aware of the possible suicide risk posed by the inmate?"  According to Plaintiff, Rosenthal "also noted there was no written documentation of any questions asked of Mr. Vigil by deputies or medical staff as to whether he appeared to be a suicide risk."  Plaintiff then explains that "Chief Foos did not conduct any additional inquiry into the matters raised by Mr. Rosenthal and could not identify any steps that were taken to investigate the questions asked by Mr. Rosenthal" before issuing a final report concluding that procedural guidelines had been followed.

The critical fact in the Court's analysis is that Rosenthal's questions and concerns were part of the file and were reviewed by Chief Foos before he issued his final report.  Defendants are entitled to ask Chief Foos how he reconciled his final report with any contradictory information appearing in the file.

7.      A drawing was found in Vigil's cell after he committed suicide.  According to Plaintiffs, the drawing depicts "a man with his back to a brick wall – with tears streaming down his face, and in the bottom right corner bears the signature 'Shawn Vigil.'"  Defendants contend the drawing is not relevant and cannot be authenticated.  Plaintiffs

argue about the drawing's relevance, but do not establish any basis for authenticating the drawing.

If the drawing is relevant, it is only because Vigil drew it. At present, the Court is not certain this can be established. Assuming the signature can be authenticated, then the picture will have been authenticated.

Defendants insist the drawing is irrelevant without evidence that anyone at the jail saw the drawing. Plaintiffs contend the fact that nobody at the Jail saw the drawing demonstrates the deputies' inattentiveness. The Court concludes the picture (if authenticated) should be admitted, and the parties can present their arguments about the weight of the evidence to the jury.

8.   Deputies maintained a log book in which they recorded their rounds in the Jail. Apparently, one or more of them described the log as a "legal document" during their depositions. Defendants want to preclude Plaintiffs from using the phrase "legal document" in connection with the log books because they are not really legal documents, and Plaintiffs insist it is proper to do so because this was the phrasing used by the witnesses.

This strikes the Court as much ado about nothing. The Court does not understand why Plaintiffs are fighting so hard to use the phrase "legal document," and the Court does not understand why Defendants care so much.

In the interests of clarity and avoiding jury confusion, the parties shall call the log books "log books" or "logs" – because that's what they are. The word "journal" may even be appropriate. The Court hopes there are not a plethora of "dictionary objections."

9.   Plaintiffs intend to elicit expert testimony from Linda Edwards, primarily in connection with Burke's claims. Defendants contend many of Edwards' opinions are irrelevant and in large measure the Court agrees.

To place matters in context it is important to understand which of Burke's claims remain in the case. In his September 30, 2010, Order, the Honorable Walker D. Miller

concluded Burke "has alleged facts which, if credited by a jury, could support a claim of disability discrimination in the course of her arrest."[3]  Judge Miller concluded the Record contained evidence that could establish a "failure of communication with the police officers who effected her arrest" resulting in the failure to accommodate her diabetes. Judge Miller also indicated a jury might find that allowing Burke to retain her Sidekick was a reasonable accommodation that would allow her to communicate.  This led to the problems following Burke's release from detention because she was unable to contact her family to advise that she had been released and needed a ride home and PADF personnel failed to provide an effective means of communication for Burke.

However, Judge Miller granted Defendants summary judgment with respect to all claims arising during the time Burke was at the PADF.  He held as follows:

> I see no discrimination in the failure to provide Burke with a sign language interpreter during the intake process at the PADF. . . . It is apparent from the medical record that she adequately was able to communicate her medical needs and her current status regarding her insulin intake and need for food.  Therefore, I conclude that writing was an equally effective means of communication in this process.  If the nurse failed to provide food as directed by the physician it would not be because of the lack of a sign language interpreter but some other oversight or error.  Any alleged problems with the blood sugar monitor or direction to give her more insulin also does not reflect inadequate communication.  The Plaintiffs have not identified any errors in the booking process or otherwise that would indicate that some essential communication assistance was needed but not provided.

Defendants were also granted summary judgment on all constitutional claims.

Many portions of Edwards' expert report address the treatment Burke received while at the PADF.  However, in the aftermath of Judge Miller's rulings there are no claims arising from that treatment, rendering those opinions irrelevant.  With these observations in mind, the specific arguments can be addressed:

---

[3] Judge Miller also issued a ruling regarding Edwards' testimony, but that ruling addressed challenges under Rule 702, not relevance.  In fact, Judge Miller specifically declined to address the relevance objections to Edwards' testimony.

9

- In paragraph 8, Edwards concludes that certain actions taken during the arrest "demonstrate[d] a deliberate and willful disregard for her medical needs." Edwards can testify about the importance of the information Burke tried to convey about her diabetes, and can testify about the effects of the officers' failure to respond. However, she cannot offer an opinion that officers' conduct constituted an Eighth Amendment violation.
- In paragraph 11, Edwards discusses the failure to provide a sign language interpreter or appropriate medical care at the police station, and again describes these failings as "deliberate indifference and willful disregard of Ms. Burke's right to an interpreter and medical care." Edwards is not qualified to offer an opinion about the requirements of the ADA or the Rehabilitation Act, and as stated above she cannot offer an opinion regarding the denial of appropriate medical care because there is no claim about medical care remaining. Edwards can testify about the medical significance of events that occurred at the police station before she was taken to the PADF.
- In paragraphs 12 through 15 and 17 through 23, Edwards discusses the failure to provide an interpreter while Burke was at the PADF. This claim is no longer in the case, so the testimony is irrelevant. Similarly, there is no claim regarding the adequacy of medical care received while at the PADF, so Edwards' opinions about that issue are also irrelevant.
- In paragraph 16, Edwards offers her opinion that Burke was in a hypoglycemic state when she was released from the PADF. One of Burke's surviving claims is that Defendants violated her rights under the ADA and the Rehabilitation Act by releasing her (1) in a hypoglycemic state, (2) without a means of communication, and (3) after refusing or failing to make arrangements for transportation. The Court believes Edwards' testimony is relevant to the circumstances of her release and (possibly) the issue of damages related to that claim.

10. Defendants' request to bar evidence of the fact that Burke accepted a ride from a stranger who then tried to assault her is denied.

11.     Plaintiffs intend to elicit expert testimony from Dr. Jean Andrews regarding difficulties and psychological effects of communications between deaf and hearing individuals.  Defendants contend this evidence should not be admitted, but the issue was addressed by Judge Miller in his June 28, 2011, Order, where he elaborated on his previous oral ruling on the matter:

> Following receipt of testimony and other evidence at the hearing . . ., I ruled in part on the issues.  To restate my oral ruling with respect to Dr. Andrews, I determined that she possessed specialized knowledge concerning communications between the deaf and the hearing to be qualified as an expert in order to opine on the topic.  This expertise included the psychological impact on the deaf.  However, I would sustain objections to any specific opinion as to the cause of Mr. Vigil's suicide.

Defendants contend this evidence should be excluded, but do not give any reason to issue a ruling contrary to Judge Miller's.  (Indeed, they barely mention Judge Miller's order at all and do not mention his ruling that the evidence is admissible).  The Court intends to adhere to the previous ruling.

12.     Defendants challenge additional opinions from Dr. Andrews that Judge Miller already ruled were admissible.  In general, the testimony relates to events that occurred outside the statute of limitations.  The Court agrees with Judge Miller's ruling that this evidence provides context for subsequent events that occurred within the statute of limitations and should be admitted.  The Court also echoes Judge Miller's invitation to the parties to "submit an appropriate limiting instruction for the jury regarding how such evidence should be treated."

13.     Defendants intend to call Michael Haley as a retained expert.  Haley is the Warden of the Mobile County Metro Jail ("MCMJ").  Defendant seek to limit Plaintiffs' ability to impeach him.

In January 2009, the Department of Justice investigated the MCMJ and issued a forty-plus page report documenting and discussing a wide variety of problems at the facility.  Included among those were deficiencies in mental health screening, particularly

during the intake process. Defendants contend (1) the report is not proof and (2) the report is hearsay. Interestingly, they raised the same arguments before Judge Miller, and Judge Miller rejected them. Defendants provide no reason to second-guess Judge Miller.

Haley has also been a party to several lawsuits regarding conditions at the MCMJ. Plaintiffs seek to introduce this fact, along with some of the evidence (including expert opinions) from those cases. The Court does not want to turn this case into a trial about conditions at the MCMJ and deems these accusations and allegations to be collateral matters. The Court's view might change if there were actual adjudications establishing that Haley oversaw an institution that violated inmates' constitutional rights; such evidence would have a bearing on Haley's credibility and would be appropriate for the jury to consider in evaluating the appropriate weight for his opinions. Mere accusations do not rise to this level and will not be admitted. In an abundance of caution, the Court directs that none of these allegations, lawsuits, and other accusations are to be mentioned in the jury's presence absent a different ruling.

14.     Ulibarri was contacted by another inmate, who told her that her son was having difficulty communicating. Defendants contend Ulibarri's testimony about the statement is hearsay. Plaintiffs have two responses, one of which is unavailing. They first contend it is admissible under Rule 803(3) as evidence of the declarant's then-existing state of mind. The problem is that in this scenario there are two levels of hearsay: Vigil's statement to the inmate and the inmate's statement to Ulibarri. Rule 803(3) may overcome the first level, but it won't apply to the second.

Plaintiffs also contend the testimony is admissible not for the truth of the matter asserted, but rather to explain Ulibarri's subsequent actions in contacting the jail. Evidence is not hearsay if it is not offered for the truth of the matter asserted, so the testimony is permissible so long as it is not used as evidence to establish that Vigil was having difficulty communicating with jail personnel. The Court will read an appropriate limiting instruction if requested.

15.     Defendants seek an order precluding Plaintiffs' expert, Dr. Mark Pogrebin, from testifying about the ADA and the Rehabilitation Act.  However, Plaintiffs deny any plans to ask Dr. Pgrebin to testify on such matters.

Defendants also contend Dr. Pogrebin should not be permitted to (1) offer opinions about medical or psychological matters or (2) testify about anything that occurred outside the limitation period for Vigil's claims.  As with the other experts, these matters were addressed in Judge Miller's June 2011 Order.  As with the other experts, Defendants offer no reason to change Judge Miller's decision.  As with the other experts, the Court intends to adhere to Judge Miller's decision.

For these reasons, the parties' motion in limine are granted in part and denied in part.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: February 10, 2012        UNITED STATES DISTRICT COURT