IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| DEBBIE ULIBARRI, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 07-CV-1814-ODS |
| | ) |
| CITY & COUNTY OF DENVER, et al., | ) |
| | ) |
| Defendants. | ) |

ORDER ADDRESSING CERTAIN PRETRIAL MATTERS

The Court has reviewed numerous submissions from the parties, including Trial Briefs, Proposed Instructions, and Objections to Proposed Instructions. The Court also participated in a telephone conference with the parties on August 31, 2012. The Court believes it prudent and helpful to memorialize some of the decisions it has made.

1.   One of the issues addressed in the briefs and in the parties' competing instructions involves Defendant's liability under state law for the negligence claims. Specifically, Defendant argues that some or all of the negligence is attributable to independent contractors employed by the Denver Health and Hospital Authority. Relying on C.R.S. 24-10-103(4)(a), Defendant argues these independent contractors are not public employees, so Defendant cannot be liable for their negligent actions or omissions. Defendant asks the Court to instruct the jury about the difference between employees and independent contractors, and further instruct that Defendant is not liable for any negligent conduct the jury attributes to independent contractors.

The Court rejects Defendant's interpretation of Colorado law, based primarily on the Colorado Supreme Court's decision in *Springer v. City and County of Denver.* In that case, the plaintiff's wheelchair hit a threshold plate in a public building, causing the plaintiff to fall out of her chair. The threshold plate was supposed to be one-half inch in height, but it was larger. 13 P.3d 794, 797 (Col. 2000). The City and County of Denver ("Denver") was sued for maintaining a dangerous condition on property. Denver argued any negligence was attributable to the entity that constructed the building, and that

entity was an independent contractor. Section 24-10-103(4)(a) provides that a "public employee . . . does not include an independent contractor," so Denver (and the Colorado Court of Appeals) reasoned that Denver could not be responsible for the negligence because the negligence was committed by an independent contractor and, hence, not a public employee. The Colorado Supreme Court rejected this argument, holding that Colorado's Governmental Immunity Law ("CGIA") gives rise to two principles:

> first, a public entity enjoys governmental immunity unless the CGIA waives immunity; and second, a public employee enjoys immunity unless the CGIA waives immunity or the employee's act or omission is willful and wanton. These are separate concepts . . . one discussing the scope of immunity for public entities, and the other focusing on the scope of immunity for public employees. *These provisions are not tied to each other such that the public entity's immunity waiver depends solely on the actions or omissions of its employees.*

Id. at 800 (emphasis supplied). As related to the case at bar, the court held "[t]he exclusion of independent contractors from the definition of 'public employee' means that an independent contractor cannot, under any circumstances, gain immunity by reason of the CGIA's provisions, not that a public entity has immunity when it constructs a public building through the services of an independent contractor." Id. Later, the court announced a more general proposition: that it did not find support "in the text of the CGIA for the proposition that a public entity is not liable for negligent acts or omissions attributable to it by the negligence of its independent contractor." Id. at 801.

Based on Springer, the Court concludes it does not matter whether any negligent acts can be attributed to Defendant's independent contractors. The distinction between "public employees" and independent contractors is relevant only in deciding whether the individuals are entitled to immunity; the distinction has no role to play in evaluating Defendant's liability. Accordingly, there is no need to explain the difference to the jury, nor is there any need to ask the jury whether any negligent acts or omissions are attributable to independent contractors.

2. On August 27, 2012, Defendant filed a Motion in Limine seeking to bar evidence of Shawn Vigil's non-economic damages because they are not recoverable under

2

Colorado's survival statute. That statute, C.R.S. 13-20-101, provides in relevant part as follows: "in tort actions based upon personal injury, the damages recoverable after the death of the person in whose favor such action has accrued shall be limited to loss of earnings and expenses sustained or incurred prior to death and shall not include damages for pain, suffering, or disfigurement, nor prospective profits or earnings after date of death." Plaintiffs addressed the issue in their Trial Brief, essentially arguing that the Rehabilitation Act and the Americans with Disabilities Act are not "tort actions based upon personal injury," so the limitation does not apply. The Court denied Defendant's motion, describing the motion as, essentially, a motion to dismiss, and declaring there was not sufficient time on the eve of trial to delve into the legal issues raised in the motion. The Court concluded by declaring "Vigil's claim will go forward, and if necessary the issue can be fully explored post-trial."

Recognizing this issue may be reasserted at a later time, the Court has considered how to proceed while minimizing the possibility of having to retry Vigil's claim. However, assuming the Court (or the Court of Appeals) later rules the federal claims are "tort actions based upon personal injury," a retrial would be necessary only if Vigil were seeking some combination of (1) noneconomic damages barred by the statute and (2) lost earnings, expenses, and other damages permitted by the statute. If this were the case, and if Vigil prevailed, there would be no way to determine which damages are permissible and which ones are not – which suggests the Court should instruct the jury to itemize the damages if it finds for Vigil on the federal claims. However, Plaintiffs' Calculation of Damages (filed on May 15, 2012) reveals that Vigil is not seeking lost earnings, expenses, or any other damages permitted by the statute. The only damages Vigil seeks are non-economic damages, so these are the only damages the jury could possibly award. Thus, if section 13-20-101's limitations apply, and if Vigil is barred from seeking non-economic damages, then the remedy post-trial will be to vacate the jury's award in its entirety and there is no need to ask the jury to itemize any damages it awards to Vigil.

3. The parties have jointly proposed that the Court read their stipulations of fact to the jury. The Court believes the better practice is to have the parties read stipulations to

the jury themselves.  This allows the parties to divulge the stipulations at the point in their presentation they believe most appropriate.  The Court will deliver a general instruction about stipulations to the jury each time this is done.

4. Eight jurors will be seated, and all will deliberate on the verdict.

5. On August 30, the Court issued an Order limiting each side to twenty-five hours to present evidence.  After discussing the matter with the parties, and having previously discussed with the interpreters the various logistical difficulties that will be faced, the Court is cognizant of the need to alter this limit if the need should arise.  While the Court is willing to revisit this time limit if circumstances warrant, for the present this limit shall remain in place.

6. The Court previously granted Defendant permission to add Roxane England to its witness list.  The Court now grants Plaintiffs' request to add England to their witness list as well.  The Court denies both parties' requests to limit England's testimony because the Court is not entirely certain what questions will be asked or what testimony she will provide.  The parties are free to assert any objections they believe are appropriate during her testimony.  Plaintiffs' request to amend their Exhibit List to include the mental health screening form used by Defendant and discussed during England's deposition is also granted.

7. Plaintiffs' motion to include two additional exhibits to their Exhibit List (Doc. # 452) is granted in part and denied in part.  Exhibit 196 will not be allowed for two reasons.  First, Plaintiffs did not disclose the existence of the exhibit to Defendant until April of this year, and did not seek to add it to the Exhibit List until August.  Defendant has not had an opportunity to depose Debbie Ulibarri about the exhibit, and permitting this untimely disclosure would be prejudicial.  Second, the Court would not permit the exhibit to be admitted because the risk that it will inflame the jury's passions easily outweighs its minimal probative value.

Exhibit 197 may be added to Plaintiff's Exhibit List.  This exhibit is a two-page portion of Roger Krebs' court file.  Defendant may seek to admit additional portions of Krebs' court file if it believes it appropriate to do so.

8.   The parties have requested that witnesses be excluded from the courtroom pursuant to Rule 615 of the Federal Rules of Evidence. The Court denies Plaintiffs' request to permit expert witnesses to remain in the courtroom unless the parties agree to this exception.

9.   The parties have agreed that Plaintiffs are "disabled" within the meaning of the Rehabilitation Act and the Americans with Disabilities Act. The Court does not perceive a factual dispute as to whether Plaintiffs are "qualified individuals with a disability" because Defendant is not suggesting Plaintiffs were not otherwise "qualified" to be arrested, arraigned, detained, jailed or incarcerated. Therefore, the jury will not be instructed about these legal concepts.

10.   The Court has already provided the parties with a copy of the instructions that it presently plans to read before opening statements. The Court plans to provide a copy of the remaining instructions at the end of the first or second day of trial, and will schedule a time to discuss the instructions with the parties. The Court's formulation of instructions will have considered the parties' positions regarding preferences and fairness and will be designed to allow both sides to fairly argue their case, and the parties are asked to focus their discussions during the instruction conference on potential legal errors that might cause a reversal, as well as grammatical and typographical errors.

11.   In its February 16, 2012, Order, the Court directed that "[i]f a witness will testify for both sides, the non-calling party shall combine their cross-examination and direct examination so that the witness need be called only once." Defendant now wishes to preserve the opportunity to recall certain witnesses. Given that the Court has imposed a "global" time limit applicable to the entirety of each side's case, the Court believes its prior directive is no longer necessary. Similarly, Plaintiffs' request to apply "party time limits" to the testimony of Rule 30(b)(6) witnesses is moot; parties may utilize their twenty-five hours as they see fit.

12.   The parties are directed to discuss the various issues regarding redacting documents. Many of the issues raised seem to have been addressed by the Court's prior orders, and the Court notes that during the telephone conference the parties were

5

able to reach substantial agreements – meaning that for the most part they do not need judicial intervention.  To further aid the parties, the Court provides the following guidance:

     a.    Defendant's Exhibit 60 is not admissible in its present form.  Defendant may seek to admit a redacted version of the Exhibit.

     b.    Defendant's Exhibit 61 is not admissible in its present form.  Defendant may seek to admit a redacted version of the Exhibit.  In particular, Sarah Burke's handwritten letter presents a concern because it contains irrelevant and potentially prejudicial information.  Defendant's stated desire of demonstrating Burke's ability to communicate in writing can be accomplished through other means, most notably by asking Burke if she can communicate in writing.  If Burke denies being able to do so, the Court will permit Defendant to impeach Burke by showing her the handwritten document.  Depending on the testimony, the Court may even deem the "increased relevance" sufficient to permit the document to be admitted.

     c.    References to the fact that Vigil was charged with a felony need not be redacted.  The nature of those felonies does need to be redacted.

     d.    The Court previously excluded Vigil's mug shot because it was not shown to be relevant – not because it was somehow prejudicial in its own right.  This ruling does not mean that every picture of Vigil needs to be excluded.  There is nothing to be gained from excising the photograph from every single record that may include it.

13.    Based on the parties' request, the Court will read the judicial notice instruction before opening statements.

14.    Plaintiffs' renewed request to impeach Michael Haley with prior adjudications and materials indicating the institution he oversaw violated Constitutional requirements is denied.  Many of the materials described in Plaintiffs' written request are not final adjudications; these include an expert's report, a Motion to Adopt Settlement Agreement, and a Magistrate Judge's Report and Recommendation.   The Court previously stated such items could not be used as impeachment and during the telephone conference Plaintiffs requested to withdraw its request as to most, if not all, of these documents.  The judgments cited – *Laube v. Haley* and *Manor v. Morgan County*

*Alabama* – involve claims of prison overcrowding. The Court declines to allow these materials to be used as impeachment because there are no claims of prison overcrowding in this case, and Haley will not be offering testimony about standards relating to overcrowding. There are also no Constitutional claims in this case, and Haley will not be offering testimony about Constitutional requirements. Finally, the nature of the claims in those suits makes it difficult to ascertain Haley's involvement in the violations, making it difficult evaluate whether those adjudications would have any real impeachment value even if this case involved similar issues.

During the telephone conference, Plaintiffs also described an adjudication finding Haley to be in contempt of court for failing to obey an order related to medical care. The Court has not seen this holding. To the extent the order relates to violations of the Eighth Amendment, the Court's prior observation that there are no constitutional claims in this case would preclude use of this Order. The contempt finding can be proper impeachment only if it relates to the topic of Haley's testimony, and there is no present basis for believing this to be the case. Plaintiffs are prohibited from discussing this matter in the jury's hearing absent further order of the Court.

17.     The Court raised the possibility of including an instruction allowing for nominal damages, at least with respect to the federal claims. Plaintiffs advised that they purposely chose not to request a nominal damage instruction, so none will be given.

18.     Defendant objected to the first instruction's description of Sarah Burke's claim related to accommodation of her diabetes. The Court reviewed Judge Miller's order on the summary judgment motions as well as the undersigned's prior orders. The Court reaches the following conclusions: First, Judge Miller held the ADA and Rehabilitation Act applied to Burke's arrest. (He held it also applied to Roger Krebs' arrest, but those claims were dismissed for other reasons). Second, the factual scenario during Burke's arrest involved communication about needed accommodations for both her deafness and her diabetes. This presents a seemingly philosophical question; namely, what was it that Defendant failed to accommodate: Burke's deafness, Burke's diabetes, or both? Finally, there are issues related to Burke's discharge that relate to her diabetes (namely, her discharge in a hypoglycemic state).

The Court believes an amendment to the first instruction is in order. The relevant sentence will be amended to read as follows: "Ms. Burke also alleges Denver failed to provide necessary accommodations for her diabetes." The Court believes this is a fair and accurate summary of Burke's claim as it relates to her diabetes.

19. Both parties objected to the first instruction's description of Shawn Vigil's negligence claim. In particular, they objected (for slightly different reasons) to the use of the word "treating." The instruction will be amended to read as follows: "Finally, Shawn Vigil's estate and his mother, Debbie Ulibarri, assert claims for negligence and wrongful death, alleging Denver failed to exercise due care in its treatment of Mr. Vigil and for failing to properly train and supervise its employees." The Court believes this amendment will keep the jury from forming the mistaken belief that the case somehow involves medical treatment of Vigil. In context, "treatment of Mr. Vigil" refers to actions and inactions involving Vigil, not necessarily medical treatment.

20. The parties are encouraged to agree to a single version of exhibits that they both intend to introduce. There is no reason to confuse the jury by, for instance, showing them Plaintiff's Exhibit 12 and Defendant's Exhibit 38 when both exhibits are exactly the same.

The parties are also encouraged to agree to the foundation of exhibits when the foundation is not in doubt. The Court will be quite displeased if it senses that a party has unreasonably declined to stipulate to the foundation of exhibits, thereby requiring the opposing side to waste its time calling records custodians and other foundational witnesses.

21. The Court does not presently intend to instruct the jury on the affirmative defenses of assumption of the risk or contributory fault/negligence. The factual underpinnings of these defenses, as described by Defendant, appear more appropriately considered as issues related to causation. Therefore, the parties are directed not to refer to these doctrines during their opening statements.

22. The Court indicated that if Debbie Ulibarri is seeking damages based on loss of consortium or companionship, she should expect that evidence bearing on her relationship with Shawn Vigil to be allowed. During the telephone conference, Plaintiffs

seemed to disclaim any effort to recover such damages. After the conference, Plaintiffs filed a Statement (Doc. # 454) clarifying that the only damages sought by Ulibarri are damages for "grief, pain and suffering and emotional stress." Despite the label employed, Plaintiffs have not avoided the effect of the Court's ruling. The extent of Ulibarri's grief, pain and suffering and emotional stress depends entirely on her relationship with her late son. In fact, the description advanced by Plaintiffs strikes the Court as exactly the same as damages due to loss of companionship. The Court's ruling remains the same: to the extent any damages sought relate to or arise from Ulibarri's relationship with Vigil, Ulibarri should expect the Court to permit evidence bearing on that relationship.

That said, the Court still lacks sufficient information to determine whether Defendant should be allowed to admit evidence related to Ulibarri's drug use. In its February 23, 2012, Order, the Court indicated it did not know enough about Ulibarri's damage claims or the evidence to be offered. The Court now knows more, but not enough to comfortably make a ruling. In an abundance of caution, Defendant is directed not to discuss, or elicit evidence about, Ulibarri's drug use in the jury's presence until the matter can be discussed further.

23. The Court will not permit Gerald Whitman or Gary Wilson to testify about Defendant's defense that accommodating Plaintiffs' disabilities would have created an undue burden because Defendant did not timely disclose that these individuals would provide testimony about, or had information about, this subject. Defendant first disclosed that Whtiman and Wilson would testify about these matters when Defendant filed – at the Court's direction – a detailed witness list that required the parties to identify the subject matter of each witness's testimony. This was well after discovery closed.

Defendant's contentions that it complied with the disclosure requirements and that Plaintiffs were not prejudiced are rejected. While it is true that Whitman and Wilson were originally named as defendants, this does not mean Plaintiffs knew all the possible topics they could testify about. Defendants suggest that it was "obvious" and "unsurprising" that Whitman and Wilson would have information about this subject – but there is a whole host of people for which this statement is true. The critical information

that Defendant was required to disclose was: of all the people who had information, from whom was Defendant going to elicit testimony?  By not disclosing this answer, Defendant essentially forced Plaintiffs to guess who Defendant might rely upon to support its affirmative defense.  Rule 26 demands more – particularly given that the testimony relates to an affirmative defense for which Defendant bears the burden of proof.  By hiding the identity of the witnesses testifying on this issue, Defendant deprived Plaintiffs of the opportunity to conduct discovery.  Defendant cannot be allowed to elicit testimony on this subject from these witnesses.

This does not necessarily mean Defendant cannot prove its affirmative defense. The Court does not know what other evidence Defendant may have.  However, witnesses and exhibits that were not disclosed in a timely and proper manner may not be used to support the defense.

IT IS SO ORDERED.

　　　　　　　　　　　　　　　　　　　　　　　　/s/ Ortrie D. Smith
　　　　　　　　　　　　　　　　　　　　　　　　ORTRIE D. SMITH, SENIOR JUDGE
DATE: September 1, 2012　　　　　　　　　　　UNITED STATES DISTRICT COURT